[No. 17197.  *En Banc.*  June 5, 1923.]

# PACIFIC TYPESETTING COMPANY, *Appellant*, v. INTERNATIONAL TYPOGRAPHICAL UNION *et al.*, *Respondents.*[1]

CORPORATIONS (261)—FOREIGN CORPORATIONS—ACTIONS—JURISDICTION—DOING BUSINESS IN STATE. The International Tpyographical Union is "doing business within this state" within the contemplation of Rem. Comp. Stat., § 226, subd. 9, authorizing service of summons upon foreign corporations in such event, where its activities includes the securing of proper hours, working conditions and pay for its members.

SAME (363)—FOREIGN CORPORATIONS—ACTIONS—PROCESS—SERVICE ON "AGENT." The International Typographical Union has an "agent" in this state within the contemplation of Rem. Comp. Stat., § 226, subd. 9, authorizing service of a summons upon "any agent" of a non-resident corporation or association doing business in this state, where it employed a person to use all lawful means to secure the adoption of the forty-four-hour week in the printing trade in Seattle, giving him full authority and control co-extensive with the association's activities; the question of his "agency" depending upon his authority to act, and not upon his acts in excess of his authority.

TRADE UNIONS (1)—TORTS (2)—LIABILITY—INJURY TO BUSINESS—INTERFERENCE WITH EMPLOYMENT—SYMPATHETIC STRIKE—COMPLAINT—SUFFICIENCY. On the principle that a third party is liable in tort for his persuasion or coercion of one to break his contract with another, a typographical union is liable to a typesetting company in its action in tort, where the complaint shows that defendant seeks to coerce the plaintiff to breach its contract with printing establishments by calling a sympathetic strike of all typesetters working for plaintiff, which was not to better their working hours, pay, or working conditions, but to embarrass the printing establishments, under contract with plaintiff and dependent upon plaintiff for metal and type, whose employees had been called out on strike to enforce the forty-four-hour week in the printing trade  (PEMBERTON, J., dissents).

TRADE UNIONS (1)—TORTS (10)—RIGHT TO CALL STRIKE—LIABILITY—INJURY TO BUSINESS—STATUTES. Since the sympathetic strike in aid of a boycott is not legalized by Rem. Comp. Stat., § 7611, prohibiting injunctions and restraining orders in case of industrial disputes between employer and employees concerning terms and conditions of payment, or prohibiting employees from ceasing to perform

[1] Reported in 216 Pac. 358.

work or labor, the statute cannot be construed to prohibit an action in tort against a labor union for the unlawful coercion of a noncombatant or disinterested bystander to break its contract with parties engaged in an industrial dispute, by means of calling a sympathetic strike of employees whose working conditions were not to be improved (PEMBERTON, J., dissents).

Appeal from a judgment of the superior court for King county, Smith, J., entered March 20, 1922, upon sustaining a demurrer to the complaint, dismissing an action in tort. Reversed.

*Poe & Falknor* and *Ralph H. Higgins,* for appellant.
*Clay Allen* and *Homer T. Bone,* for respondents.

MACKINTOSH, J.—The amended complaint of the appellant contains these allegations: that the plaintiff was the owner of a linotype, monotype and printing plant, valued at about $30,000, and in the operation of the plant employs a number of workmen, who were members of the International Typographical Union; that the business was increasing in volume, a substantial portion of which consisted of furnishing printing establishments with linotyping and monotyping; that the respondent International Typographical Union was a voluntary association, with many members, and that it was impracticable to bring all of them before the court; that the respondent Philo Howard was an organizer and executive agent thereof at Seattle, where he represented the International Typographical Union; that the respondent Seattle Typographical Union No. 202 was a voluntary association of this state, associated with the other respondent International Typographical Union; that the members of the local union were numerous and it was impracticable to bring them all before the court; that the other named respondents were officers and members of the local union; that in May, 1921, the respondents called out the members of the

local union and ordered them to cease work in various printing establishments of the city of Seattle with whom the appellant had contracts under which appellant was furnishing these establishments with linotyping and monotyping, and that the reason for this calling out of the members of the local union was the failure of these printing establishments to grant to the members the "forty-four hour week;" that the International and local unions, for the purpose of compelling and forcing these printing establishments whose employees had been called out to grant to said employees a forty-four hour week, called out and caused to cease work for the appellant all of the employees of the appellant who belonged to the local union, and that such employees did obey the call and cease their employment; that these printing establishments from whom the respondents had demanded a forty-four hour week were dependent upon the linotyping and monotyping concerns for their metal and type necessary for their printing, and that the appellant was one of such concerns upon which these printing establishments so depended; that the purpose and object of the calling out of the employees of appellant, who belonged to the local union, was not to better hours, wages or working conditions of said employees, but to hinder, injure and embarrass the printing establishments dependent on appellant for their metal or type in carrying on their business, and to prevent appellant from furnishing such printing establishments the material necessary to the successful conduct of their business; that this call was contrary to the wishes and desires of the employees of appellant, who were called out and ceased work because of fear of suspension, fine or reprimand from the local union to which they belonged, and not because such employees desired

any improvement in hours, wages or working conditions, and there was no controversy between appellant and the employees on these matters; that highly skilled labor is necessary in the operation of linotype and monotype machines, and that it was impossible for the appellant to replace the employees called out from its establishment with satisfactory substitutes; that the respondents knew these facts and knew that great damage would be occasioned to the appellant by calling out and requiring its employees to cease work; that the calling out of appellant's employees resulted in great damage to the appellant, and that its business has been demoralized and damage has been occasioned it in the sum of $20,000, which is prayed for.

The International Typographical Union appeared specially and moved that the service upon it be quashed. This motion was accompanied by the affidavit of Philo Howard, which stated that a copy of the complaint had been served on him as a representative of the International Typographical Union; at the time of service he was not authorized to receive or accept service, and that his only authority from that union was to employ all lawful means to secure and induce the employing printers to adopt the forty-four hour week scale of employment. The other defendants filed a demurrer to the complaint on the ground that it did not state facts sufficient to constitute a cause of action. The motion to quash service as to the International Typographical Union having been granted, and the demurrer of the other defendants to the complaint having been sustained, this appeal followed.

Two questions require answers: first, was the service upon Howard sufficient to bring the International Typographical Union into the case; and second, does the complaint state a cause of action.

First: Varying facts have produced varying results in cases involving the validity of service upon foreign corporations or associations, but where these foreign corporations or associations are doing business within this state and have an agent herein, service upon such agent is sufficient. Section 226, subd. 9, Rem. Comp. Stat. [P. C. § 8438]. It becomes necessary to determine whether this association, the International Typographical Union, was doing business within this state.

It can hardly be argued that it was not, for among the important activities of an association such as this is the securing of what its members deem proper hours of labor for them in their trade and the adoption of satisfactory working conditions and pay. These constitute the major purposes and the principle activities of such organizations. They are created primarily to attain these results, and the effort in any community to secure from their employers the adoption of any or all of these beneficent standards of employment is engaging in the very business for which they continue their existence. Therefore, when the International Typographical Union authorized Howard to employ all lawful means to secure the adoption of the forty-four hour week in the printing trade in Seattle, it authorized him to carry on the business of the association to that important extent.

The next question is, whether the International Typographical Union, being engaged in business in this state, the respondent Howard became its agent. It is, of course, to be conceded that service upon a mere servant or employee would not suffice, and that if Howard's status was merely that, then the service was not adequate. His affidavit shows that he was to use such lawful means as were necessary to accomplish the purpose of the International union. As far as that

association was doing business within the state, he had the entire direction and control of it; his authority was co-extensive with the association's activity. The standard laid down in many cases of commercial organizations requiring the agent to have authority to enter into contracts, make binding agreements, and so forth, can have little weight in determining the question of the extent of Howard's authority. For this was not a commercial organization. Its lines of endeavor were restricted, but within those lines Howard exercised full authority and control.

The case of *Rich v. Chicago, Burlington & Quincy R. Co.*, 34 Wash. 14, 74 Pac. 1008, held that a railroad corporation was not doing business in the state by merely advertising. *Arrow Lumber & Shingle Co. v. Union Pac. R. Co.*, 53 Wash. 629, 102 Pac. 650, held that a railroad was not doing business by distributing advertising matter and soliciting freight. In *Macario v. Alaska Gastineau Mining Co.*, 96 Wash. 458, 165 Pac. 73, L. R. A. 1917E 1152, it was held that a mining company located in Alaska was not doing business in this state by purchasing and forwarding operations here. In *Alaska Pacific Navigation Co. v. Southwark Foundry & Machine Co.*, 104 Wash. 346, 176 Pac. 357, it was held that a person was not an agent who was merely employed as a mechanical engineer of a foreign corporation for the purpose of installing a piece of machinery. In *Watson v. Oregon Moline Plow Co.*, 113 Wash. 110, 193 Pac. 222, it was held that a foreign corporation was not doing business in this state through an agent where the person who it was claimed was an agent was merely buying machinery from the foreign corporation and selling it here on his own account. These represent the class of cases where service has been quashed. In *Grams v. Idaho National Har-*

*vester Co.*, 105 Wash. 602, 178 Pac. 815, it was held that a foreign corporation was doing business in this state where it had a warehouse in which were kept extras and repair parts of machinery sold by them, and that an employee of such manufacturing company is an agent for the service of process where he had been sent to this state to check up and take possession of the stock of goods in such warehouse. In *Barrett Mfg. Co. v. Kennedy,* 73 Wash. 503, 131 Pac. 1161, this court reviewed a number of cases from this and other courts on this subject and said:

"The words of the statute 'any agent' were intended to have a broad meaning, and must be liberally construed to effectuate the legislative intent. While they may not include a day laborer or an employee who has no authority to represent the corporation in any way other than to discharge his daily task, they must be held to include all such agents as represent the corporation in either a general or a limited capacity."

And in the late case of *Sunada v. Oregon-Washington R. & Nav. Co.*, 118 Wash. 241, 203 Pac. 64, service upon the assistant freight cashier of a foreign railroad corporation was held sufficient. Courts recognize that the general tendency of the authorities is in harmony with the foregoing quotation, giving a liberal construction to the statute. As was said in *Beach v. Kerr Turbine Co.*, 243 Fed. 706:

"The tendency of legislation and of judicial decisions is and has been to make it easy to obtain jurisdiction of foreign corporations. As was said by Mr. Justice Gray in *Barrow Steamship Co. v. Kane,* 170 U. S. 100, . . . 'The constant tendency of judicial decisions in modern times has been in the direction of putting corporations upon the same footing as natural persons in regard to the jurisdiction of suits by or against them.' "

The International Typographical Union argues that Howard was only authorized to use lawful means to secure the advancement of the union's program for a forty-four hour week, and that he could not become an agent for the purpose of service where the complaint shows that his actions were unlawful. This argument is fallacious as applying to Howard as an agent upon whom service could be made. The question of whether he had exceeded his authority in calling the strike in the appellant's plant is not a question to be determined in passing upon a motion to quash service. That is a question going to the merits of the controversy, and if the facts show that Howard's acts, whatever they may have been, were unauthorized and not in any way binding upon the International Union, that is a matter to be proved in the trial of the case, and, if proved, might render the union not liable in damages. *Embree v. McLennan,* 18 Wash. 651, 52 Pac. 241.

The question of the validity of the service depends upon whether Howard was in fact the agent conducting the business of the association in this state, not whether he may, in the conduct of that business, have done things for which he had no authority. To adopt a rule such as respondents suggest would be to relieve foreign corporations of amenability to the jurisdiction of the courts of this state by service upon an agent where the agent had done, in addition to the acts authorized by his principal, any unauthorized acts. The International Typographical Union was legally served. The trial court was therefore incorrect in sustaining the motion of the International Union to quash the service.

Second: The important question in this case is whether the complaint states a cause of action. To get a clear view of the exact situation it is necessary to clear the ground of several obstructions raised by

closely related questions, which, however, are not in this case. This case is not one involving the question of whether, under any circumstances, the members of a labor union have the right to strike. The strike against the printing establishments was a lawful strike, involving as it did the question of hours of labor. It is conceded that such right exists in certain instances. This case is not one involving a controversy between the appellant and respondents as to wages, terms, hours or working conditions. The respondents have no complaint to make against the appellant as to any of these matters. This case is not one involving the question of whether picketing or boycotting is lawful. This case is not one involving the breach of a contract on the part of a labor union. This case is one in tort against an outsider, who, it is alleged, interfered with the business of the appellant, and it is claimed that this outsider is liable for its illegal invasion of the appellant's rights, and this illegality is to be determined not by the respondents' good or bad motives or by its peaceful or violent acts. The situation here is one of an industrial conflict between employer and employee involving the hours of labor, where a non-combatant, the appellant, who, prior to the conflict, had been furnishing the product of its plant to one of the parties to the conflict, was continuing during the conflict to carry on its customary and ordinary work, preserving a strict neutrality, taking no part in the conflict, aiding and assisting neither of the parties, is attacked by one of the parties to the conflict for the reason that the appellant's continuance of the *status quo ante* results in making it more difficult for the employees to successfully wage their conflict with their employers. The respondents' efforts are to conscript the non-combatant appellant into their service

in the conflict and use it as an active agency in respondents' behalf; to make of the appellant a weapon in the hands of the respondent. This is not a case where a person not a party to the conflict between the employer and employee has, by some act of his own, after it has begun, injected himself into that contest and become a party to it, and the question of whether a strike might lawfully be called against such a person is not involved in this case.

The case is not here on its merits, but is to be determined upon the demurrer to the complaint. From the complaint it appears that the appellant is in a helpless situation. There was no demand made upon it which it could comply with; there were no terms imposed which it could meet. The relations between the appellant and its employees were satisfactory. The respondents' action, which would result in serious detriment to the appellant's business, could not be prevented by any act of the appellant. The complaint discloses a situation of an impartial bystander being forcibly and against his will used by one of the parties to the contest as an instrumentality to accomplish the defeat of the other contending party.

The sociologists, economists and courts have written much and variously regarding the fundamentals underlying this and related situations. Nothing new remains to be said, and the attempt to review the great mass of legal opinion would be to imitate the futile toils of Sisyphus. The elementary principle invoked to sustain the appellant's position is that which is inscribed on the old landmark of the law—*Lumley v. Gye,* 2 El. & Bl. 216—that a third party is liable in tort for his persuasion of one to break his contract with another, a principle which has received continual sanction. In one of the recent cases re-announcing the

doctrine, *Central Metal Products Corporation v. O'Brien*, 278 Fed. 827, it is said "it is settled law that one may not induce or persuade, much less coerce, one to break his contract with another." *New England Cement Gun Co. v. McGivern*, 218 Mass. 198, 105 N. E. 885; *Parkinson Co. v. Building Trades Council of Santa Clara County*, 154 Cal. 581, 98 Pac. 1027. The effort here is to coerce the appellant to breach its contracts with the printing establishments. Although we find no case on all fours with the case at bar, there are in the books many cases involving the question of secondary boycott which in their essence are not distinguishable from the principle here involved. The courts holding that a secondary boycott is unlawful have done so upon the broad theory that one not a party to industrial strife cannot against his will be made an ally of either one of the parties for the purpose of accomplishing the destruction of the other. See *Hopkins v. Oxley Stave Co.*, 83 Fed. 912; *American Federation of Labor v. Buck's Stove & Range Co.*, 33 App. D. C. 83, 32 L. R. A. (N. S.) 748; *Iron Molders' Union No. 125 of Milwaukee v. Allis-Chalmers Co.*, 166 Fed. 45; *Pickett v. Walsh*, 192 Mass. 572, 78 N. E. 753; *Burnham v. Dowd*, 217 Mass. 351, 104 N. E. 841; Labatt's Master & Servant, vol. 7 (2d ed.), 8346; *Hitchman Coal & Coke Co. v. Mitchell*, 245 U. S. 229, 62 L. Ed. 260; *Truax v. Corrigan*, 257 U. S. 312.

The cases dealing with the question where a boycott was involved present situations where the boycott was invoked against non-combatants furnishing material and products to the employers against whom the strike was in operation; to situations where the boycott has been invoked against non-combatants who were using the products of employers against whom a strike was in operation; to situations where the boycott had been

invoked against an employer himself upon the finished product furnished by his plant where a strike was in operation, but under them all rests the reason which we have given for their decision. That reason is as applicable to the instant case. The appellant was in no way participating in the strike called against the printing establishments. It had not taken advantage of that opportunity to enter into any new and profitable work by performing part of the work theretofore done by the printing establishments themselves. According to the complaint, it was merely continuing to perform work which it was obligated to perform by its engagements made prior to the calling of any strike against the printing establishments. The respondents compelled it to violate its contracts to its financial hurt, and to cease what the complaint alleges is a very material portion of its profitable business. There was no alternative. For the purpose of aiding the respondents in their struggle, the appellant was to be ground in the mill. The complaint alleges that these acts of the respondents were not with the sanction of the appellant's employees, who, of course, had the right to voluntarily quit the appellant's employ, it being admitted in the complaint that they were not under contract with the appellant, save one terminable at will. The acts of the respondents, if proven as alleged, constituted a conspiracy sufficient to render them liable, as the doing of a lawful act by unlawful means has been held in many cases to impose liability.

Attention is called by the respondents to the act of the legislature of this state in ch. 185, Laws of 1919, p. 568 (Rem. Comp. Stat., § 7611) [P. C. § 3547], an act generally known as the one legalizing labor unions. This act is modelled upon the Federal Clayton act, but

it is not in some of its aspects as far reaching as the Federal act. Section 2 of the act reads as follows:

"No restraining order or injunction shall be granted by any court of this state, or any judge or judges thereof in any case between an employer and employee or between employer and employees or between employees or between persons employed and persons seeking employment involving or growing out of a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable damage to property or to a personal right or to a property right of the party making the application, for which injury there is no adequate remedy at law, and such petition must be in writing describing such damage or injury feared by the applicant, and sworn to by the applicant or his agent or attorney. No such restraining order or injunction shall prohibit any such person or persons, whether singly or in concert, from terminating any relation of employment or from ceasing to perform any work or labor; or from paying or giving to, or withholding from any person engaged in such dispute, any strike benefits or other moneys or things of value; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this section be considered or held to be illegal or unlawful in any court of the state."

Section 20 of the Clayton act is as follows:

"That no restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the ap-

plication, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in ·concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States." 38 U. S. Stat., at. L. 730.

The case of *Duplex Printing Co. v. Deering,* as it was tried in the circuit court of appeals, is found in 252 Fed. 722, where it was held that the Clayton act legalized a secondary boycott in so far as the boycott consisted of refusal to work for one who had dealt with the principal offender. The supreme court of the United States, on the appeal found in 65 Law Ed. 349, reversed the circuit court of appeals and held that the Clayton act did not legalize the so-called secondary boycott; that the operation of the Clayton act must be confined to those who are proximately and substantially parties to the dispute respecting the terms, conditions and hours of employment, and that to instigate a sympathetic strike in aid of the boycott was not

permissible under the Clayton act. If this is true under the Clayton act, which, as we have noticed, is broader in its scope than our local statute, the same result must be arrived at when applying our statute. We therefore hold that, as far as this statute is concerned, the complaint is not demurrable.

It is impossible to refer to all of the cases cited by respondents, but a few typical ones may not unnecessarily lengthen this opinion. *Searle Mfg. Co. v. Terry*, 56 Misc. Rep. 265, 106 N. Y. Supp. 438, is distinguishable from the case at bar for the reason that there the concern against which the strike was called had, by taking over some of the work from a factory against which a strike was in operation, aided to that extent and made itself a party to the controversy. The case of *Bossert v. United Brotherhood of Carpenters & Joiners of America*, 77 Misc. Rep. 592, 137 N. Y. Supp. 321, would seem to justify the calling of a secondary boycott, as does the case of *Bossert v. Dhuy*, 221 N. Y. 342, 117 N. E. 582. In the case of *Cohn & Roth Electric Co. v. Bricklayers', Masons' & Plasterers' Local Union No. 1*, 92 Conn. 161, 101 Atl. 659, the court in direct terms refused to decide the question of "whether an agreement to strike in which the striking workmen are not concerned in a trade dispute or in which their labor has not come into competition with non-union labor is lawful." The case of *Scott-Stafford Opera House Co. v. Minneapolis Musicians' Association*, 118 Minn. 410, 136 N. W. 1092, presented one where a union was not restrained from enforcing the rule not to play in an orchestra unless all the members of the orchestra were members of the union. This decision merely recognizes the right of persons to refuse to work for any one except upon terms satisfactory to them. The entire situation cannot be better expressed than it is in *Iron*

*Molders' Union No. 125 of Milwaukee v. Allis-Chalmers Co., supra,* although the court was not there dealing with the precise question before us:

"And in the struggle wherein each is seeking to hold or enlarge his ground, we believe it is fundamental that one and the same set of rules should govern the action of both contestants. For instance, employers may lock out (or threaten to lockout) employees at will, with the idea that idleness will force them to accept lower wages or more onerous conditions; and employees at will may strike (or threaten to strike), with the idea that the idleness of the capital involved will force employers to grant better terms. These rights (or legitimate means of contest) are mutual and are fairly balanced against each other. Again, an employer of molders, having locked out his men, in order to effectuate the purpose of his lockout, may persuade (but not coerce) other foundrymen not to employ molders for higher wages or on better terms than those for which he made his stand, and not to take in his late employees at all, so that they may be forced back to his foundry at his own terms; and molders having struck, in order to make their strike effective, may persuade (but not coerce) other molders not to work for less wages or under worse conditions than those for which they struck, and not to work for their late employer at all, so that he may be forced to take them back into his foundry at their own terms. Here, also, the rights are mutual and fairly balanced. On the other hand, an employer, having locked out his men, will not be permitted, though it would reduce their fighting strength, to coerce their landlords and grocers into cutting off shelter and food; and employees, having struck, will not be permitted, though it might subdue their late employer, to coerce dealers and users into starving his business. The restraints, likewise, apply to both combatants and are fairly balanced. These illustrations, we believe, mark out the line that must be observed by both. In contests between capital and labor the only means of injuring each other that are lawful are those that operate directly and immediately

upon the control and supply of work to be done and of labor to do it, and thus directly affect the apportionment of the common fund, for only at this point exists the competition, the evils of which organized society will endure rather than suppress the freedom and inititative of the individual. But attempts to injure each other by coercing members of society who are not directly concerned in the pending controversy to make raids in the rear cannot be tolerated by organized society, for the direct, the primary, attack is upon society itself. And for the enforcement of these mutual rights and restraints organized society offers to both parties, equally, all the instrumentalities of law and of equity.''

From the briefs and argument of the respondents it appears that they are contending for an interpretation of the complaint which the pleading does not justify. In their statement of the case it is said:

''Seattle Typographical Union No. 202, which will be referred in this brief as Local 202, was at and prior to the time of the beginning of the within action on strike against certain printing establishments in the city of Seattle, Washington. By reason of this strike, these establishments were unable to do the work which their men had been doing. They were sending their monotype and linotype work to appellant.''

It is further stated:

''Local No. 202 was conducting a strike in the city of Seattle against certain printing establishments. Its members had left the service of firms against which they were conducting a strike for a forty-four hour week. Under all the authorities this was a 'legal' strike. These firms, being unable to fill all the places left by the strikers, and being desirous of continuing their business and soliciting orders were taking orders for printing and sending the composition work to appellant to set up in its plant.''

With such a situation in view, respondents have argued the case, referring to a number of authorities.

Among others, they quote from the syllabus of the case of *Iron Molders' Union No. 125 of Milwaukee v. Allis-Chalmers Co., supra,* as follows:

"A manufacturing company whose skilled workmen are on strike has a right to seek the aid of other manufacturers to make or complete its products, and the strikers have the reciprocal right to seek the aid of their fellow workmen in the employ of such other manufacturers, to prevent that end, and may lawfully combine and co-operate for that purpose."

And still further, respondents employ the language found in 16 R. C. L. 448, as follows:

"Striking employees cannot be enjoined from inducing employees in factories by which their former employer is attempting to get the work done to fill his contracts to refuse to work on it, although it results in the owners of such factories breaking their contracts."

Immediately following the last citation, respondents say:

"The author of this very excellent work, Ruling Case Law, has here summarized for us the very contention now made on behalf of the respondents."

Thus it appears that the respondents contend in their argument and authorities that the case is one against the appellant because it became an active participant, instead of remaining neutral, in the controversy between the employees of those establishments which refused to yield to the demand for a forty-four hour week and their employers. We cannot find, however, that such is the case presented for our decision as made by the complaint, to which a general demurrer was sustained. A careful examination and consideration of the complaint does not show that the appellant in this case became a participant in the controversy by taking on any work other than that it was already

doing for the employers of the striking members of the union. It states, in effect, that, prior to the calling out of the appellant's employees, the appellant was already operating under business arrangements with the other printing establishments, under and by virtue of which it did the monotyping and linotyping for such other establishments, and there is no allegation whatever that, after the strike against those employers who refused to yield to the demands of the union and for whom the appellant was performing work under its contracts, any additional work whatever was undertaken for them by the appellant. The respondents argue as though the facts were quite different from those which their demurrer to the complaint admits to be the actual facts in the controversy. Recognizing the law to be as respondents contend for in the authorities just referred to, it cannot be available in the absence of pleading and proof of facts to which it is applicable.

For the reasons assigned, the judgment is reversed and the cause remanded with directions to the trial court to overrule the demurrer.

MAIN, C. J., HOLCOMB, BRIDGES, FULLERTON, and PARKER, JJ., concur.

MITCHELL and TOLMAN, JJ. (concurring)—We concur in the result reached in the majority opinion. Upon the question of whether the complaint states a cause of action, the latter portion of the opinion, commencing with the words: "From the briefs and argument of the respondents it appears that they are contending for an interpretation of the complaint which the pleading does not justify," immediately following the quotation from the case of Iron Molders' Union No. 125 of Milwaukee v. Allis-Chalmers Co., 166 Fed.

45, comprehends the situation and tersely expresses our views.

PEMBERTON, J. (dissenting)—Recognizing that the concurring opinion states the law, I am satisfied, however, that the trial court properly interpreted the complaint in its memorandum opinion as follows:

"The defendants are seeking to improve their own conditions of living by lowering the hours of labor from forty-eight to forty-four hours per week. That object is not unlawful and has much merit. In pursuit of that object they refuse to work for employers who insist upon maintaining a forty-eight-hour week of work. Their hope of success is in lawfully causing their opponents such loss of business that they will prefer to accept a program of a forty-four-hour week. To this end the defendants refuse to allow their own members to work for the offending employers and seek to persuade others not to do so. If fully successful in such an effort, the result would be that these employers could not secure competent employees and they could not maintain their business, in this case, of supplying printed matter to their customers. But if these offending employers can for a time place their business in the hands of other printers and thereby retain their own trade, they may ultimately tire out or wear out their opponents. It follows that the scene of strife shifts from the field of original combat to the shop of the ally of the offending employer. Can the employing unions follow their opponents to the new field of action and bring pressure there to win their cause?

"Bear in mind that the direct purpose of the defendants is to ameliorate their own conditions of labor, to promote their own industrial welfare. They have primarily no quarrel with plaintiff as the ally of their opponents. Plaintiff, with full knowledge of the strife prevailing between defendants and their opponents, voluntarily assumes to aid those opponents by doing their printing, thereby enabling them to retain their customers and maintain their business."

Paragraph IV of the complaint states:

"That on or about May 10th, 1921, the defendants, the International Typographical Union and the Seattle Typographical Union No. 202, by and with the consent and active cooperation of the other defendants herein and their associates, called out and directed to cease work the employees of said Seattle Typographical Union No. 202 in certain other printing establishments with whom this plaintiff had business arrangements, under which it did the linotyping and monotyping for such other printers, because such other establishments would not grant to said employees certain hours of employment . . ."

Paragraph VII of the complaint states as follows:

"That said other printing establishments upon whom said defendants had demanded a forty-four-hour week, and which refused and still refuse to make such concession, customarily and ordinarily, and in accordance with the usages in the printing trade were dependent upon the linotyping and monotyping establishments and printing shops for their metal or type necessary for their printing, among which linotyping and monotyping establishments was the plaintiff, and that the purpose and object of calling out said employees of the plaintiff belonging to said Seattle Typographical Union No. 202 was not to improve or better the wages, terms, hours or working conditions of said employees, but to further injure, hinder and embarrass the said other printing establishments who were dependent upon the plaintiff for their metal or type in carrying on their printing business, and to prevent this plaintiff from furnishing to such other printing establishments the metal or type necessary to the successful conduct of their said businesses . . ."

The strike against the other printing establishments was interfering with their printing business, and appellant admits in its complaint that the union men were called out of its establishment in order to prevent it "from furnishing to such other printing establish-

ments the metal or type necessary to the successful conduct of their said businesses." .Appellant voluntarily ceased to be an innocent bystander, but became an active participant in the controversy, and, under the authorities referred to in the concurring opinion, cannot recover.

The demurrer to the complaint was properly sustained, and I therefore dissent.