Common Pleas Court of Cuyahoga County.

BECKERMAN ET AL V. BAKERY & CONFECTIONERY WORKERS INTERNATIONAL UNION.

Decided February 27, 1931.

*Hon. John A. Cline,* for plaintiff.
*William Corrigan,* for defendants.

KENNEDY, J.

This action was commenced by Charles Beckerman and Abraham Beckerman who are engaged in the bakery business, at 895 East 105th Street, Cleveland, under the firm name of Beckerman Brothers. For many years they have employed Union labor in their bakery, and for the last three and a half years their relations with their employes and the Union seemed to have been cordial.

Charles Beckerman, the senior brother, who is the executive member of the partnership, began work at his trade when he was eleven years of age, and by industry has built up an extensive business and valuable good will, and has erected his own building in which he conducts his business.

The Bakery & Confectionery International Union of America, Local 56, is a labor union composed of about sixty members, mostly Jewish bakers, and for a number of years has had a written agreement with Beckerman Brothers, the last agreement having taken effect May 1, 1930, and which by its terms would, except for the matters set forth herein, expire May 1, 1931.

There is in Cleveland an organization known as The Jewish Master Bakers Association composed of about twenty firms who manufacture baked goods, of which association Beckerman Brothers is a member.

The Union prepared a printed form of agreement which was signed by the business agent of the Union on behalf of Local 56, and signed by the individual firms of the Master Bakers Association who would agree to the terms imposed by the Union.

There were three firms who belonged to the Association who had refused to sign the agreement with the Union, one of them, Hyman Dembovitz, being a charter member of the Association which was incorporated under the laws of Ohio.

Until 1930 no complaint had been made against the Master Bakers' firms which signed the Union agreement,

either because Dembovitz belonged to the Association, or because the Union Master Bakers were members of the Association of which there were nonunion shop members.

Peace had reigned in the industry for about three years, and employers and employes enjoyed amicable and prosperous relations. In spite of the fact that the Jewish bakers made bread by hand and hence was more expensive than machine-made bread used by Gentiles, the trade had grown in importance and wages were maintained at $70.00 per week of seven and a half hours a day.

Trouble and discord resulting in a strike occurred in the year 1927 which was finally composed by the efforts of Mr. Goldstone, an international organizer of New York, who succeeded in bringing peace into the disturbed relations by inducing the Business Agent of the Union, Charles Miller, to resign and the bakery firms to renew their agreement. There is credible evidence that the peace was celebrated at a banquet at which masters and laborers were entertained, and at which the promise was made that "Miller should never again be elected to office in the Union."

Following this banquet, Harvey Friedman, one of the defendants, was elected business agent, and he was followed by others from time to time, until December 3, 1930, when Charles Miller was again elected business agent, a strong minority of the union dissenting, and his salary was fixed at $76.00 per week.

Trouble began almost immediately in the industry. On December 12th a full page advertisement was published in the Jewish newspapers stating that the Union demanded the observance of its contract with the Association and cheaper bread. No specific breach of the contract was detailed. The article was inflammatory and declared that the public should no longer be robbed by high priced bread, etc. The Master Bakers held its weekly meeting the afternoon on which the advertisement appeared, and a committee composed of Union National Organizer Schmidt and two other unionists called at the meeting place and requested to speak to Mr. Meyer Rosen, the business manager of the Association. They demanded that Rosen and the other masters "keep their agreement" with the Union. Mr. Rosen requested them to

come into the meeting and state their grievances, which they refused to do, giving as their reason that Dembovitz Kronenberg and Pessin, three non-union shop members of the association, were in attendance at the meeting. Mr. Rosen then requested the committee to have the Union appoint a grievance committee to meet with the grievance committee of the Master's Association, which they also refused to do.

The Union working agreement provided, among other things, that all disputes should be settled by grievance committees to be appointed by each party, and then if failure of agreement resulted, the matters in dispute should be arbitrated as provided in the agreement.

The Union refused to appoint any grievance committee or any arbitrators, and on Friday night, December 12, 1930, a strike was called against all Master Baker shops except three. No complaint was made of Beckerman Brothers' conduct; no notice was given of the intention to strike other than the newspaper notice which appeared the day the strike was called. The Union also had no notice that it would be precipitated into a strike until the meeting of December 12th. National Organizer Schmidt of Chicago was present at the meeting ready to conduct the strike, and it thus appears that the strike was fomented and arranged without knowledge of the Union when the members were asked to vote to sustain Miller's action.

The minutes of the Union meeting of December 12th states that "the strike is being called because the bosses do not carry through the agreement they have with the Union, and the price of bread should be cheaper". No statement of any more explicit reason for calling the strike was given, and the price of bread was not a part of nor mentioned in the agreement, and therefore could not be a lawful cause of the strike.

Beckerman Brothers did not know that their employees had struck until, having failed to come to work as usual, Charles Beckerman called up and learned a strike had been called. No complaint had ever been made against Beckerman Brothers by the Union, its officers, nor by their employees, before the strike was called, nor did

Charles Beckerman know why the strike had been called against his firm.

The International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers Local No. 334, known as the drivers' union, simultaneously called a strike of its members at the request of the bakers union, and the drivers union has been actively assisting the bakers by picketing and assistance in other manner.

Union Labor may be a powerful force for good in any community. Labor has the right to combine and improve its conditions, to increase wages, to enforce sanitary conditions, to shorten hours of labor, or to accomplish any other benefit to the men and women who toil. The courts of Ohio have repeatedly recognized this right and are always quick to protect the workers in the full enjoyment of its well established rights. Except for the unselfish efforts to ameliorate the condition of the worker, he would not have advanced to the proud position which he occupies in the civilized world today. In America, more than in any other land, and in Ohio especially, labor is respected and admired for its large contribution to the economic advancement of the human race. The leaders who have fought the battles of labor with a far seeing and intelligent unselfishness may well claim a debt of gratitude from our citizens.

It is unfortunate, however, that sometimes the labor unions are officered by men who do not appreciate their duty to their members, their employers, or the public. Some of these misguided men, in furtherance of their private interests, would tear down the splendid edifice which the real leaders of labor have erected, and thus bring ruin to the industries in which they are engaged with consequent unemployment to those whom they are elected to serve.

For many years we have respected, admired and assisted labor in the achievement of its legal rights and it is with genuine regret that we are called upon in our judicial capacity, to restrain those unlawful acts committed by laboring men in a time of passion and prejudice aroused by men who do not think of what they do, or are thinking selfishly, to gain some personal advantage for themselves.

The reciprocal rights and duties of labor and capital are well expressed in the case of *LaFrance* v. *Electrical Workers,* 108 O. S., 61, in which case the Supreme Court of Ohio declared:

"Equality of justice demands that in any controversy the rights of all parties be scrupulously maintained. The right of workmen to be employed, irrespective of union membership, must be maintained; the right of the employer to conduct his business without *illegal* interference must be upheld; and legal means employed by strikers must not be curtailed. Among the latter are the right of peaceful picketing, the peaceful persuasion of employees to terminate contracts at will, and the peaceful persuasion of expectant employees not to accept work with the employer in question."

These rights of labor are now generally conceded, but *no unlawful acts* are justified under the law.

From the evidence it appears to the court that the real causes of the strike are that Business Agent Miller desired to do something to prove to his Union that he was earning the seventy-five ($75.00) dollars per week and the use of the automobile which was allowed him; and secondly, to compel the Master Bakers Association to expel the three non-union shop members thereof. Until the trial was in progress it is evident no specific charge was made to Beckerman or the Association of any violation of the Union agreement. In fact one of the members of the Union, when asked by counsel for plaintiff what he was striking for, remained mute and was unable to state any reason for the strike, and this witness had been on the picket line for about three months.

Mr. Miller's activity to cause dissension in the peace existing in the industry, began with his election December 5th, culminated when the strike was called December 12th, without notice to Mr. Beckerman and without notice to the Union members except a few; that there was cause for complaint. The minutes of the Union prior to December 12th show no cause for dispute, and no mention is made therein of any requests or demand for arbitration of any supposed difficulties through their respective grievance committees. After the strike had been called, the good faith of the employers is shown by the fact that Mr.

Rosen, the business manager of the employers association, called upon Mr. Faulkner, the United States Conciliator of Labor Disputes, and attempted a reconciliation. He secured the presence of Mr. Goldstone, of New York, international union organizer, who attended several meetings of the Association members. The minutes of the Union of January 16, 1931, state as follows:

Brother Goldstone reports that he with a committee was present at a meeting with a representative of the Labor Department, in order to explain the condition of the strike. It was also demanded by the bosses that the strike should be arbitrated point by point. And also that Brother Miller should cease to be a leader in the Union. A motion was made that the strike should continue,—such motion was carried.

It was claimed during the trial *for the first time* that the bakers employed by Beckerman were compelled to work overtime without pay. The evidence on this point is not convincing, for although the workers testified that they complained to the business agent of the Union concerning the overtime work, neither the business agent nor the Union ever made any complaint to Beckerman about the alleged grievance. The business agent to whom the complaint was said to have been made by the workers was Mr. Eisen, who was not called as a witness to verify the complaint or to explain why he failed to attempt to obtain compliance with the agreement which provided good pay for overtime work.

The evidence of the defendants showed that at the end of each week's work, the amount of overtime worked by each employee was checked between the worker and Beckerman, and a check given each worker for the full amount and including overtime. The employees' story is further weakened by cancelled checks introduced in evidence which showed that overtime payments had been made on numerous occasions, and in several instances the pay checks amount to more than $75.00 for one week's work. The employees were unable to explain the increased amount of the checks over the amount due them for time actually worked.

The second real cause of the strike was the attempt

to compel the withdrawal of Dembovitz, Kronenberg and Pessin from the Association. The record shows many instances of the injection of this disturbing element into the strike. The Union had no legal right to punish Beckerman Brothers because the Association did not expel the non-union shop members, or because they refused to withdraw.

Mr. Dembovitz was a charter member of the Association, and for many years the Union had entered into individual agreements with the members of the Association with the full konwledge of the non-union shop members being therein. Not until Mr. Miller was elected as business agent the second time was this a cause of complaint. The Union had waged its fight against the non-union shops, but not until December 12, 1930, did it attempt to discipline the Association because it had on its roster the non-union shop members.

The strike against Beckerman, because of the Union's grievance against Dembovitz and others, is in the nature of a secondary boycott against him, which courts have almost universally condemned.

*Pacific Typesetting Co.* v. *International Typographical Union,* 125 Wash. 273; 32 A. L. R. 767; *Nusbaum* v. *Retail Clerks International Protective Assn.,* 227 Ill. App. 206; *Overseas Storage Co.* v. *Chlopsek,* 209 App. Div. 834; *Parker Paint & Wall Paper Co.* v. *Local Union,* 105 S. E., 911; 16 A. L. R. 222; *Mechanics Foundry & Machine Co.* v. *Lynch,* 236 Mass. 504; 12 A. L. R. 1057; *Gilchrest* v. *Metal Polishers,* 113 Atl. (N. J. Eq.) 320; *Duplex Printing Press* v. *Deering,* 254 U. S. 443; *Quinn* v. *Leathem,* A. C. 495; 1 B. R. C. 197; *Hawthorn Drain* v. *Hawkin,* 227 N. Y. 1; 6 A. L. R. 901; *Wilson* v. *Hey,* 232 Ill. 389; 16 L. R. A. (N. S.) 85.

The evidence shows no lawful cause for a strike; no legitimate trade dispute existing between Beckerman Brothers and the Union; and the latter in calling the strike against Beckerman Brothers violated its agreement with that firm. The strike so called, without just cause, in violation of the agreement, was unlawful and all acts done in the furtherance of that strike are necessarily unlawful.

Even though it be conceded that the strike was a lawful one, growing out of a legitimate trade dispute, the evidence shows that the picketing and boycott was carried out by unlawful acts of the defendants.

The day following the calling of the strike, pickets appeared in the street in front of Beckerman's shop declaring the strikers demanded union conditions and cheaper bread. The wives and children of strikers were pressed into service as pickets. Mrs. Adler and Mrs. Cohen were appointed a picket committee in charge of the wives of strikers. Many witnesses stated the pickets assaulted customers; they shouted that Beckerman's bread was mixed with blood; that they employed negroes in their shop; that their bakery was unsanitary; bread was taken from the possession of customers and thrown in the street; patrons coming out of the store were told "we hope you choke"; they were followed to their homes; parades of children carrying banners, escorted by union leaders made demonstrations in front of. Beckerman's and other bakeries. The banners carried untruthful and insulting inscriptions.

Every Saturday morning for eight weeks a parade of Young People's Socialist Club was held. The paraders wore red sweaters with the letters Y P S C inscribed thereon. These parades were escorted by union strikers, and when the parade arrived in front of Beckerman's store, the noise and shouts of the paraders had an intimidating effect upon prospective customers. On one occasion a "stench bomb" was thrown into the store, which drove all customers out, valuable merchandise was destroyed, and the store rendered unfit for business for about four days.

A secondary boycott was carried on against Beckerman's customers who were threatened by pickets if they did not refuse to sell Beckerman's bread. One instance is sufficient to illustrate the method of intimidation carried on by the strikers. One Sol Ravitz, a union member, called on two customers of Beckerman, named Greenberger and Schultz, and informed them that if they bought Beckerman bread, their stores would be picketed. The evidence shows that when Ravitz called on his regular route the

Beckerman bread was not on display, but once when he was not expected, Beckerman's bread was on display and the union-made bread was hidden away. A few requests from Ravitz so frightened Schultz that he discontinued the sale of Beckerman's product, although two-thirds of his customers were driven away.

The result of these unlawful acts was to injure the business of the plaintiffs which resulted and is resulting in large financial loss to them.

From all the evidence the Court is compelled to find the facts relating to the calling and prosecution of the strike are as follows:

1. The strike was called by the Union in violation of its contract with Beckerman Brothers without any previous notice thereof, without the existence of any just cause for the strike, and at a time when no legitimate trade dispute existed between plaintiff and the defendant.

2. There was no violation of the agreement by Beckerman Brothers, and the refusal of the Union to appoint a grievance committee which is provided for in the union agreement, or to arbitrate the alleged differences, constitutes a breach of the agreement.

3. The strike was called to punish the non-union members of the Master Bakers Association, and constituted a secondary boycott against the plaintiffs.

4. The picketing and boycott against the plaintiff's business, there being no legitimate trade dispute existing between them, is unlawful, and all acts done to carry out the strike are therefore unlawful.

5. The picketing and boycott maintained against the plaintiff was accomplished with force and intimidation and are unlawful acts, even though the strike was lawfully called in consequence of a legitimate trade dispute.

6. The acts of the wives and children of the workers engaged on the picket line were promoted and advised by the defendants. The distribution of the inflamatory and untruthful circulars, as well as the parades which were held were accompanied by intimidation and disorderly conduct, and are unlawful. These acts were done in association with union members and the responsibility therefore cannot be cast aside.

7. The defendants carried on a secondary boycott against certain of the plaintiff's customers and by means of threats, both express and implied, caused them through fear of punishment, to cease patronage with Beckerman.

8. That the Drivers Union and its members have

aided, abetted and conspired with the Local Union 56 to carry on the strike and boycott, and it should be restrained from the commission of any further unlawful acts.

9. It was claimed that Communistic influences were at work in the strike at the instances of the Union. Although one circular signed by a Communistic committee was distributed, there is no evidence tending to show any connection of the Union officials therewith. All witnesses of the Union charged therewith, indignantly denied membership in the Communistic party and participation in the circulation of the inflammatory and seditious pamphlets.

10. We find that Local Union 56 Bakery & Confectionery Workers International Union of America; The International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, Local No. 334, and its members; Charles Miller; Louis Eisen; all pickets, particularly Harry Winter, Abraham Grossman, Isadore Rabenstein, Nathan Kramikoff, Julius Greenspan, Mary Adler, Harvey Friedman, Rose Friedman, Louis Eisen, Nathan Shrotsky, Louis Cohen, Morris Kritzer, Sol Ravitz, Abraham Shapiro, Sam Lattin, Philip Newmark, Joseph Schmit, together with all officers, agents, persons, employees, sympathizers who in any manner advise, aid or abet in the doing of the unlawful acts herein set forth, should be and they are perpetually enjoined as prayed for in the petition and as indicated in this opinion.

Under the evidence and the law we are compelled to find, as indicated above, that the strike and boycott now carried on by Local 56 is unlawful and the Union and those of its members who aid and participate therein, as well as all advisors, aiders, abetters, sympathizers and adherents, who carry on or assist in the unlawful strike, will be enjointd perpetually as prayed for in the petition and as indicated in this opinion; and counsel for plaintiff may draw a journal entry in accordance with this opinion; although some of the persons named in this order are not referred to in the petition the evidence shows they aided and assisted to carry on the unlawful strike.

Notice of appeal is given and bond fixed at $200, to all of which defendants may have their exception.