## INTERNATIONAL UNION OF OPERATING ENGINEERS et al. v. J. A. JONES CONST. CO. et al.

Court of Appeals of Kentucky.
June 1, 1951.

Bullitt, Dawson & Tarrant, Chas. I. Dawson, and Thos. S. Dawson, all of Louisville, for appellant.

Skaggs, Hays & Fahey, John K. Skaggs, Jr., and Martin R. Glenn, all of Louisville, Swift, Pease, Davidson & Chapman and J. Q. Davidson all of Columbus, Ga., for appellee.

STANLEY, Commissioner.

The appellees are two foreign corporations united under the name of The Jones-Wright Company as joint contractors for the building of the Wolf Creek Dam on the Cumberland River in this state. The appellants are labor unions with whom a collective bargaining agreement was made for a class of craftsmen employed on the job. "Local No. 181, International Union of Operating Engineers" is a constituent unit of "International Union of Operating Engineers, (A. F. of L.)", both unincorporated, voluntary associations. For brevity we will refer to them as Local and International, respectively. Other appellants are a number of individual members of the union who were made parties as representatives of the class for the determination of a question of common and general interest of both organizations and all their members. Sec. 25, Civil Code of Practice. The suit was brought by the contractors against the appellants to have the court construe the agreement with the labor unions with respect to the duration of its provisions covering wages. The controversy is whether the agreement is to remain in effect until the job of building the dam is completed or whether it expired by its terms on or about January 1, 1949. The court adjudged it to be until the work is done.

The first question to be considered is the overruling of a motion by International, made in a special and reserved appearance, to quash the return on the summons. The summons directed that it be served on "Joe A. Pirtle or Montie Bashion, its chief officer or agent in Jefferson County, Kentucky." It was served on Pirtle in such capacity. Another process was served on Bashion as agent of both International and Local as well as one of fifteen individuals, alleged to be members of both unions. International's motion was upon the ground that neither Pirtle nor Bashion was its agent or representative. Their affidavits stated they were not such agents. There was no counter-affidavit or evidence offered at the time. The motion was overruled. International reserved its exception and, denying waiver, filed demurrers and an answer. It is conceded that Pirtle and Bashion were agents of Local Union and that it was properly sued and brought before the court.

Section 51(6), Civil Code of Practice, provides that in an action against an association which has "for the transaction of any business, an office or agency in any county of this state other than that in which the principal resides, service of process may be had on the agent or manager in charge of such office or agency, in

all actions growing out of or connected with the business of that office or agency."

In Jackson v. International Union of Operating Engineers, 307 Ky. 485, 211 S.W.2d 138, these two defendants were sued for damages, as were a number of individuals as representative of all their members. The same Joe A. Pirtle was served with process as agent of both unions. The question of whether the unions could be sued as entities or brought before the court in a class action was raised, but the question of agency of Pirtle for service of process was not raised. Nor was the question raised whether the service of members of the class brought the union as an entity or all the membership before the court. We held that the unions as such could be brought before the court by service on their agents, and in effect also under the provisions of Sec. 25, Civil Code of Practice, by service on members who, because of their position, could be deemed to represent the class having general and common interests. The special demurrer by which jurisdiction was challenged did not raise the same question of authority as does the motion to quash the return of the summons. The present suit follows both lines of procedure approved in the Jackson case. It is against the unions as organizations or quasi-corporations and against their members as a class. Upon the uncontradicted affidavits supporting the motion to quash the return upon International the court should have sustained the motion, prima facie.

■ The question follows whether or not the court may consider subsequent developments of the record in a trial of the merits and whether they revealed that the interlocutory order overruling the motion, Bastian Brothers Co. v. Field, 280 Ky. 727, 134 S.W.2d 648, was proper or that any judgment could have been entered against International as a party over which the court had acquired jurisdiction. If it was not, so shown, then the judgment would be void. Missouri-Kansas Pipe Line Co. v. Hobgood, 244 Ky. 570, 51 S.W.2d 920. We think this is a proper inquiry for the question before us is the validity of the judgment. If the developments during the course of the trial show the court did have jurisdiction, to hold the judgment invalid because of the erroneous interlocutory order that it did would be to subordinate the substance of justice to the form of procedure.

We look to those developments. In the Hobgood case just cited, it is held that service of summons upon an agent of a subsidiary corporation controlled by another having its own officers and agents amenable to service of process is not service upon the parent or controlling corporation. But the distinction is there drawn between the relationship of such independent bodies and the relationship where the parent corporation utilizes the services of its subsidiary corporation or its agents to transact the business out of which the litigation arose. In such a case service of process will be sustained upon the ground that it was had upon persons through whom the business was transacted. International Harvester Co. v. Commonwealth, 147 Ky. 655, 145 S.W. 393; Postal Telegraph Cable Co. v. Thornton, 153 Ky. 176, 154 S.W. 1100. It is to be remembered that we are not here dealing with corporations having separate existence through charters granted by the state, but dealing with voluntary unincorporated associations which, however, have the quality or nature of corporations.

We come to the point where it must be determined in which category the present case falls. While regarded as entities, neither body is distinct from its individual members as a corporation is of its stockholders. Is the Local and its members merely an agency of International so that it must be regarded as identical or as its alter ego through which it transacts business in Kentucky, as held in International Harvester Co. v. Commonwealth, supra, and Postal Telegraph Cable Co. v. Thornton, supra? International and its local union have a common constitution. There is no independent membership in the parent body separate and apart from the membership in the local unions except where a charter has lapsed or been revoked, any member under certain conditions may become classified as a "member of the Gen-

eral Office Membership." This is apparrently to maintain a union status temporarily. The parent body possesses and dominates its constituent parts. The locals have very little automony. They are given certain rights of local organization and administration, but over all stand the reserved powers of the parent body to approve or disapprove its action. Some of the many bonds of unity may be mentioned. The purposes and objects of the organization include, the encouragement and assistance of local unions in negotiating and consummating contractual relations of the members with their employers and in other matters affecting them and Labor generally. All sovereign power is vested in International by general conventions made up of delegates from local unions, the general officers, executive board, and board of trustees. There are references throughout the constitution to "the International Union and its members." When a referendum is taken on whether the annual convention shall be postponed, it is of the "entire membership." Cf. Tobacco Workers' International Union v. Weyler, 280 Ky. 355, 132 S.W..2d 754. All local charters are granted by International, and are subject to revocation or suspension. Certain books and supplies are furnished the Local but title thereto is retained by International, and upon revocation of the charter all its funds and property become the property of the parent body. Admission to membership is declared to "constitute a contract between the members, his Local Union, the International Union, and every other member therein." Every member pledges obedience to the "constitution, laws, rules, obligation, and ritual and the decisions, orders, and directions of the International Union or its subordinate branches." Every member promises to hold in secrecy "all business transactions and affairs of the International Union, its subordinate divisions and officers within" his knowledge. Every member pays through the Local an initiation fee to International. It also receives twenty per cent of the initiation fee of the local union. International requires the payment to it of $1 per month "per capita tax" for every member. All these demands are subject to increase or decrease by the superior body. The president of the International Union has power to direct and supervise all local unions, their officers and members. The constitution also provides that the employment of any officer, business agent, or representative by a local union shall not be valid unless approved in writing by the president of the International Union. Every member and officer is subject to discipline, suspension and expulsion by the president. When he exercises that power, he takes over the administration of the affairs of the Local and fills the vacated offices. Finally it is provided "All agreements and modifications thereof between Local Unions or the members thereof and the employers shall require, before becoming effective, the approval of the General President in writing, or by telegraph." It is further declared that no local union shall "attempt to take or take any action involving a rupture of relations existing under a legal contract with any employer or declare a strike where such contract exists" unless "the same has been sanctioned by the General President of the International Union." In case of a strike or lockout, International comes to the aid of the men and the Local, makes the legal defense and pays benefits to "its members." Death benefits are paid by International to "beneficiaries of members."

Preparatory to submitting a bid for the construction contract, the contractors, at the suggestion of a representative of a local of this union in Knoxville, Tennessee, addressed a letter of inquiry to Arthur Watkins, Evansville, Indiana, as "the International representative in charge of your interests on the Wolf Creek Dam job in Kentucky." He met with the contractors for a conference in Nashville. Two weeks later, on March 21, 1946, there was a general meeting in Somerset, Kentucky, of representatives of the contractors, subcontractors, and of several labor unions for the purpose of discussing and agreeing upon labor terms. Watkins (stated later to be business representative of the Local), V. L. Kelly, "Supervisor" (described as a dep-

uty of the president of International), and Leslie Atherton (who became representative of the union on the job) were present. The agreement which is the subject of this litigation was there made with these men. The letter of confirmation containing the ambiguous provision was addressed to Mr. Watkins in Evansville, Indiana, and accepted by him. So it appears that International was an active participant in the negotiations and the consummation of the agreement made in Kentucky.

At the time this suit was filed, there was a strike by the men of this union which, with the establishment of its picket line, practically stopped work on the project. Mr. Kelly, as official representative of the International union, participated in the efforts to settle the strike at a meeting held in the office of International in Washington and at meetings with a Government conciliator.

Foreign cases upon the point of service of process do not help much. There are differences in procedural statutes and rulings with respect to the suability of labor unions, some denying they are amenable to suit as entities and others holding that their members are not subject to a class action. But the following cases seem to be pertinent authority under the opposite conceptions stated in the Jackson case, supra, and under the provision of our Civil Code of Practice, Sec. 51(6), above quoted, with respect to service of process on any representative of an association in an action arising out of or connected with the business of the association transacted in Kentucky.

In Schluter v. Trentonian Publishing Co., 4 N.J.Super. 294, 67 A.2d 189, the International Typographical Union appealed from an order refusing to set aside service of a summons and determining that the service was effective. The claim rested on the contention that the union was not transacting business in New Jersey in such a manner and to such an extent as to subject it to the jurisdiction of the court. The International Union was described as a voluntary association made up of local unions, which, in turn, are associations, each functioning under a charter issued by the International. The opinion recites the dominance of that body over the locals, which was perhaps not as great in degree as the appellant in the instant case. It was shown the parent union's representatives had taken an active part in a strike. True, the agent served with process was more clearly its own agent, but the point was that the general union was doing the very business it was established to do. The court held there was jurisdiction. See also Pacific Typesetting Co. v. International Typographical Union, 125 Wash. 273, 216 P. 358, 32 A.L.R. 767. In Moran v. International Alliance, etc., 139 N.J.Eq. 561, 52 A.2d 531, 532, it was shown that the relation and control of the general union of theater employees over its local organization is of the same pattern. The court held (quoting the syllabus prepared by the court): "An unincorporated International labor union, although having no office or place of business in this state, should be regarded as voluntarily submitting itself to the jurisdiction of the courts of this state when duly served with process, when it grants charters to representative units or agencies called Locals to do business in this state and through those Locals and the membership thereof engages in activities in this state designed to further the objects for which the International was organized."

In Edgar v. Southern Ry. Co., 213 S.C. 445, 49 S.E.2d 841, 844, it was shown that the superior union of the Order of Railway Conductors of America functioned through a local organization known as a Division. Considering the constitution and laws of the unions, the court said: "The defendant Order, when it, through its agents, solicits membership in this State in its association, collects dues from its members in this state, sets up its committees for adjustment of dispute between its members and their employer, issues contracts of insurance to its members, and in all other respects prosecutes its activities in this State as a labor union, is doing business within this State so as to subject it to the jurisdiction of the Courts of this State." Recognizing previous rulings that service of process must be upon an agent and not merely a member of an unincor-

porated association in order to acquire jurisdiction over it, the court held that there was proof of such close relationship between the Order and the Division that service of process on a Local Chairman of a Local committee of the Division, which automatically made him a member of a similar committee of the general body, brought both organizations before the court. This was upon the construction of provisions of the union constitutions. The court said, "There can be little room for doubt that the Local Divisions are part of the defendant Order and representatives of it."

In the present case we think the foregoing recitations show there is not merely unity in relations but a regency, a dominant control in many particulars by the general union. The veil of distinct entities sought to be placed between them as a shield against the processes of the court is a thin and flimsy one, easily pierced. Here the appellant, International Union of Operating Engineers, was certainly doing business in Kentucky through its Local as its agency. It is, therefore, within the broad terms of our procedural law, Sec. 51(6), Civil Code of Practice, which makes any agent or representative in charge of an agency of an association transacting business in the state its process agent.

We conclude that the Local Union is the International Union itself in action. Therefore, service on the agents of the Local was sufficient to bring International before the court as an organization, and that service upon representatives of the class of members brought its membership before the court.

We come to the construction of the agreement.

Following the conference at Somerset, the General Superintendent of the Contractors addressed a letter on April 2, 1946, as we have stated, to Arthur Watkins, representative of the Unions, confirming the agreement. This is regarded as the contract. Since under familiar law a contract is to be interpreted as a whole and the entire instrument considered to determine the meaning of each part, Siler v. White Star Coal Co., 190 Ky. 7, 226 S.W. 102, we reproduce the letter in full.

"In order that we may have a written record of our understanding with you local, we herewith wish to reiterate the agreement made at the meeting of 20 March 1946, at the Beecher Hotel, Somerset, Kentucky as follows:

"1) Your craft agreed to start the job at the wage schedule set forth in the contract documents covering construction of the Wolf Creek Dam, a copy of such schedule was given to you.

"2) It was agreed that if the rate set forth in these contract documents was not satisfactory to your local you would negotiate for a new rate and when such new rate had been agreed upon by this contractor and your local, joint application would be made to the Wage Adjustment Board in Washington for approval of such negotiated agreed upon rate.

"3) It was further agreed that the wage rate set at the start of the job (which is either the rate set forth in the contract documents or negotiated rate as approved by the Wage Adjustment Board) would last for the duration of this contract for the construction of Wolf Creek Dam, Russell County, Kentucky, which is estimated to take 1000 days or until 1949.

"4) It was agreed that your craft would work time and one-half for all overtime Mondays through Fridays and all day Saturday. On Sundays and Federal legal holidays double time would be paid for all time.

"It is requested that you sign the carbon copy of this letter as your agreement to the above conditions and return same to us for our files. The original is for your files."

Mr. Watkins endorsed the copy, "We agree to the above," signed it as business agent of the Local, and returned it to the Contractors.

The ambiguity is in paragraph (3), the question being whether the agreed rates of pay should continue "for the duration of this contract for the construction" of the dam or for "1000 days or until 1949."

When the suit for an interpretation was filed, the members of these unions had been

on strike since July 1, 1949, and were under an injunction of the Russell Circuit court against violence.

■ On motion of the Unions the court heard parol testimony. Some correspondence between the parties, the contract made with the War Department and orders of the Federal government covering the construction of the dam were filed. The evidence was permitted to take a wide range. In a large measure, it concerned the Somerset conference and was aimed at revealing the understanding of the respective parties as to the duration of the job and the bargaining agreement. Much of it comes close to being evidence as to what was meant to be agreed upon or to be the meaning of what was written, which may not be considered, Illinois Cent. R. Co. v. Vaughn, 111 S.W. 707, 33 Ky.Law Rep. 906, rather than to show the objects of the contract and the circumstances and conditions surrounding the parties, which is a legitimate aid in the interpretation. Mc-Hargue v. Conrad, 312 Ky. 434, 227 S.W. 2d 977. In that, there is hopeless contradiction. Witnesses for the Contractors say there was no mention whatever at the conference of how long the agreement should continue in effect or how long it would take to finish the dam, except that there was some casual inquiry by some unidentified person or persons during a recess. Witnesses for the Unions, however, say that the question was raised and it was definitely stated and understood to be 1,000 days, that time being emphasized by the remark of an officer of the Contractors that if it not completed in that time, it would cost them $500 a day. It is quite certain that the schedule of wages was pleasing to the workmen at the time. The rates were higher than the minimum fixed by the Government, and much higher than wages prevailing in the community. It was the belief also that there would be a depression and reduction in wages generally rather than the increase that occurred. There are other facts that are more certain. Preparatory to making a bid for the job, the Contractors had received documents from the Government concerning wages and labor relations and these were considered in the preliminary negotiations with these and other unions looking to stabilization of wages. The government contract specified minimum hourly rates of wages as determined by the Secretary of Labor. Upon these things the Contractors rested their bid and contracted to do the work. It was for specific unit prices, based upon estimated quantities of "units" necessary to be furnished or done, such as excavation, material, implements and work. The total aggregated $18,369,870.34. These estimates, however, were subject to provisions for adjustment to meet contingencies. But the rates per unit were not. The contract called for the completion of the job "within 1,000 calendar days after the date of receipt of notice to proceed." But the contract also provided, "or any extension thereof." On January 1, 1949 (the claimed expiration of 1,000 days) the job was only about three-fourths finished. Extensions were granted by the Government to March 30, 1950, and because of strikes of these workmen, with consequent sympathetic work stoppages of others, further extension was given to March 31, 1951.

All this information was before the conference at Somerset. The letter refers to these in paragraphs (1) and (2). That agreement must be construed in the light of the knowledge by all parties of these contractual provisions and schedules, for they became in effect part of the labor agreement. Breckinridge County v. Beard, 233 Ky. 823, 27 S.W.2d 427; 12 Am.Jur., Contracts, Sec. 245.

Looking at the ambiguous terms in connection with them, it is readily apparent that the addition of the clause "which is estimated to take 1,000 days or until 1949" was adapted from the definite term stated in the government contract. But that cannot be considered in isolation, for the same contract provided, as we have noted, that there should be, as there was, an extension of the time in which to complete the job. Furthermore, that contract itself stated the "estimated quantity" of each item of material and work, and that was variable as the work progressed. But the price per

unit was fixed. So too was the time for doing the job only an estimate; but the amount of the hourly wages was fixed. Cf. Hoerth v. City of Sturgis, 221 Ky. 835, 299 S.W. 1074, 1075, 1078. Considering all the other provisions, it seems to us that the figures in the parenthetical clause are nothing but an "estimate" which was subject to variation. Certainly such a phrase does not in and of itself vary the definite statement in the labor union contract (Par. 3) that the agreed wage rates "set at the start of the job. * * * would last for the duration of this contract for the construction of the Wolf Creek Dam." The intent thus expressed is sustained by having regard for all the supporting documents referred to, and the necessity that wages should be stabilized upon the basis on which the contractors had obtained the contract. Otherwise, the contractors would have entered upon a large risk of greatly increased cost not intended to be taken. The objective or general purpose and intent of this wage agreement was to make certain for the "duration" the schedule of wages which went into the total contract cost of building the dam.

We accept as a correct statement of the law: "Where repugnancy is found between clauses, the one which essentially requires something to be done to effect the general purpose of the contract is entitled to greater consideration than the other. The whole agreement should, if possible, be construed so as to conform to an evident consistent purpose. Accordingly, a subsequent clause irreconcilable with a former clause and repugnant to the general purpose and intent may be disregarded." 12 Am.Jur., Contracts, Sec. 244. Our opinions are in accord. Black Star Coal Corp. v. Napier, 303 Ky. 778, 199 S.W.2d 449.

We conclude that this troublesome added phrase was thrown in as comment or a prophecy. As such, or even as merely an indefinite expression of flexible significance, it must yield. It should not control or supersede the definite term of "duration." "The definite and precise will prevail over the indefinite". 17 C.J.S., Contracts, § 358. Under such regard, it can be reconciled. If not this, then the definite term, "last for the duration," must be eliminated altogether, and that should not be done under cardinal rules for construing a contract.

The judgment being in accord, it is

Affirmed.