[No. 37076.   Department Two.   October 29, 1964.]

HARRY B. CALBOM, JR., *Respondent,* v. HALVOR KNUDTZON,
SR. *et al., Appellants.**

*Reported in 396 P. (2d) 148.

*Evans, McLaren, Lane, Powell & Moss* and *Frank W. Draper,* for appellants.

*Atwell, Moore, Walstead & Hallowell,* for respondent.

HAMILTON, J.—Plaintiff (respondent) instituted this action seeking recovery of damages upon the grounds that

defendants (appellants) had interferred with and induced a breach of an attorney-client relationship. Defendants appeal from an adverse judgment.

On May 1, 1958, K. T. Henderson, sole proprietor of a successful general contracting business, unexpectedly died of a heart attack. His death created pressing problems pertaining to the continuing operations of his business. Mrs. Jessie Bridges, Mr. Henderson's office manager, immediately contacted plaintiff, who was personally acquainted with the Hendersons and who, as a practicing attorney, had served them occasionally. Plaintiff, in substance, advised Mrs. Bridges that before he could intelligently give counsel he would have to know whether Mr. Henderson left a will and, if so, who was named as executor or executrix therein, and the provisions thereof. Mrs. Bridges then contacted Mrs. Henderson and a meeting was arranged between plaintiff, Mrs. Henderson, and Mrs. Bridges. At this meeting, it was disclosed that Mr. Henderson had left a will naming Mrs. Henderson his executrix, and that she desired to continue the business. She requested that plaintiff make arrangements to carry out her wishes.

Plaintiff prepared the necessary papers and at 4 p.m. on May 1, 1958, appeared with Mrs. Henderson and Mrs. Bridges before the Superior Court of Cowlitz County, at which time the will was offered for probate, Mrs. Henderson designated as executrix, and an order authorizing continuance of the business was entered. The following day, Mrs. Henderson was fully qualified as executrix and, with plaintiff's assistance, accounts at the bank were adjusted whereby business obligations, including the payroll of the business then due, were met, and a letter relating to and confirming an outstanding bid to a local school district for school construction dispatched. Plaintiff prepared to perfect and continue probate of the estate.

On May 6th, it was necessary for plaintiff to go to California. Before leaving, he checked with Mrs. Bridges to ascertain any immediate needs, and was informed there was none. Between May 6th and May 8th, Halvor Knudtzon, Sr., the senior member of the firm of Knudtzon and Asso-

ciates, certified public accountants, returned from a trip. On May 8th, he was consulted by Mrs. Henderson relative to performing the tax work in connection with the estate. At this meeting, Mr. Knudtzon inquired of Mrs. Henderson if she had selected an attorney, to which she replied "Yes, I suppose Harry Calbom." Whereupon, Mr. Knudtzon shook his head and indicated, by inference at least, that plaintiff was unsatisfactory. Mr. Knudtzon thereupon recommended a list of attorneys from which one was selected.

On May 9th, plaintiff returned and was advised by Mrs. Bridges that another attorney was handling the probate matter. Thereupon, he contacted Mr. Knudtzon, Sr., and requested a meeting, which was arranged for that morning. Mr. Knudtzon, who was at home when contacted by plaintiff, telephoned his son at the office and advised him that plaintiff was coming in to confer with them, and that they would give him "a line of hot air." When confronted by plaintiff at their office, plaintiff was advised by Mr. Knudtzon, Sr., that they, as accountants, hired and fired attorneys for their clients and made reference to a former probate matter in which they had been instrumental in discharging the attorney.

Subsequently, an effort was made to pay plaintiff for services he had performed and secure his signature upon a notice of substitution of attorneys. Plaintiff refused to submit a bill for his services up to the time of his termination, refused to agree to a substitution of attorneys, and instituted the present action against the defendants alleging intentional interference with plaintiff's employment contract.

Trial of the action consumed several days, at the conclusion of which the trial court rendered an oral decision in favor of plaintiff and thereafter entered findings of fact, conclusions of law, and judgment. The essence of the trial court's findings were: (a) Plaintiff was an ethical, reputable, and competent attorney; (b) plaintiff had a contract with the surviving widow to probate the estate of K. T. Henderson, pursuant to which plaintiff undertook performance of the probate proceedings; (c) defendants, with knowledge of plaintiff's contract of employment, inten-

tionally, maliciously, and without justification induced the surviving widow to discharge plaintiff as attorney for the estate, and (d) plaintiff suffered damage in the amount of the reasonable attorney's fee he would have earned had he continued to the conclusion of the probate.

On appeal, defendants make 13 assignments of error, which reduce themselves to five basic contentions: (1) The evidence does not support the trial court's finding that a contract of employment existed, or that defendants had knowledge of such contract; (2) the contract of employment, if any, was illegal and contrary to public policy; (3) the interference, if any, with the relationship was justified; (4) plaintiff failed to submit competent proof on the issue of damages and would, if entitled to recover, be entitled to recover only nominal damages; and (5) the trial court erred in admitting certain evidence.

Intentional and unjustified third-party interference with valid contractual relations or business expectancies constitutes a tort, with its taproot embedded in early decisions of the courts of England, *e.g.: Keeble v. Hickeringill,* 11 East 574, 11 Mod. 74, 130, 3 Salk 9, 103 Eng. Rep. 1127 (1809); *Lumley v. Gye,* 2 El. & Bl. 216, 118 Eng. Rep. 749 (1853); *Bowen v. Hall,* 6 Q.B.D. 333, 50 L.J.Q.B. 305 (1881); *Temperton v. Russell,* 1 Q. B. 715, 62 L.J.Q.B. 412 (1893); *South Wales Miners' Federation v. Glamorgan Coal Co.,* A.C. 239, 74 L.J.K.B. 525 (1905).

From and with the English decisions, the tort has become engraved upon American law, generally unsullied in principle, although with some case by case distinctions. See, Carpenter, Interference with Contract Relations, 41 Harv. L. Rev. 728; Prosser on Torts (3d ed.) § 123, p. 950; 30 Am. Jur., Interference § 61, p. 95; 84 A.L.R. 43; 9 A.L.R. (2d) 228; 26 A.L.R. (2d) 1227.

We have recognized the tort in its various forms. *Jones v. Leslie,* 61 Wash. 107, 112 Pac. 81 (1910); *Seidell v. Taylor,* 86 Wash. 645, 151 Pac. 41 (1915); *Pacific Typesetting Co. v. International Typographical Union,* 125 Wash. 273, 216 Pac. 358, 32 A.L.R. 767 (1923); *Sears v. International Broth-*

*erhood of Teamsters, Chauffeurs, Stablemen & Helpers of America, Local No. 524,* 8 Wn. (2d) 447, 112 P. (2d) 850 (1941); *Hein v. Chrysler Corp.,* 45 Wn. (2d) 586, 277 P. (2d) 708 (1954); *Titus v. Tacoma Smeltermen's Union Local No. 25, International Union of Mine, Mill & Smelter Workers,* 62 Wn. (2d) 461, 383 P. (2d) 504 (1963).

The fundamental premise of the tort—that a person has a right to pursue his valid contractual and business expectancies unmolested by the wrongful and officious intermeddling of a third party—has been crystallized and defined in Restatement, Torts § 766, as follows:

"Except as stated in Section 698 [betrothal promises], one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
   "(a)   perform a contract with another, or
   "(b)   enter into or continue a business relation with another
is liable to the other for the harm caused thereby."

Clause (a) relates to those cases in which the purposeful interference of a third party induces or causes a breach of an existing and valid contract relationship. Clause (b) embraces two types of situations. One is that in which the interferor purposely induces or causes a party not to enter into a business relationship with another. The second is where a business relationship, terminable at the will of the parties thereto, exists, and the intermeddler purposely induces or causes a termination of such relationship. The distinction between the situations propounded by clauses (a) and (b) lies not so much in the nature of the wrong, as in the existence or nonexistence, and availability as a defense, of privilege or justification for the interference. Restatement, Torts § 766, Comment c.

■ The basic elements going into a prima facie establishment of the tort are (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or ex-

pectancy has been disrupted. Ill will, spite, defamation, fraud, force, or coercion, on the part of the interferor, are not essential ingredients, although such may be shown for such bearing as they may have upon the defense of privilege.

■ The burden of showing privilege for interference with the expectancy involved rests upon the interferor. Prosser on Torts (3d ed.) § 123, p. 967; 30 Am. Jur., Interference § 57, p. 93. The basic issue raised by the assertion of the defense is whether, under the circumstances of the particular case, the interferor's conduct is justifiable, bearing in mind such factors as the nature of the interferor's conduct, the character of the expectancy with which the conduct interferes, the relationship between the various parties, the interest sought to be advanced by the interferor, and the social desirability of protecting the expectancy or the interferor's freedom of action. Restatement, Torts § 767. Some of the privileges and their limitations, which have been recognized, depending upon the circumstances and the factors involved, are legitimate business competition (Restatement, Torts § 768), financial interest (Restatement, Torts § 769), responsibility for the welfare of another (Restatement, Torts § 770), directing business policy (Restatement, Torts § 771), and the giving of requested advice (Restatement, Torts § 772).

Against the backdrop of the foregoing, we turn to defendants' contentions.

Defendants first assert that the evidence does not support the trial court's finding concerning the existence of an attorney-client relationship between plaintiff and Mrs. Henderson whereby plaintiff would undertake the "long term" probate of the estate. This assertion is predicated upon the argument that the testimony of Mrs. Henderson and Mrs. Bridges, coupled with the surrounding circumstances, indicate that Mrs. Henderson only intended to engage plaintiff's services for the limited purpose of admitting the will to probate and securing an order authorizing continuation of the business.

We agree that the evidence presented by defendants upon this point is susceptible of the interpretation defendants would place upon it. However, such is not the only interpretation finding support in the evidence as a whole. The evidence reveals that at the meeting on May 1, 1958, after plaintiff had explained the necessity for probate proceedings, Mrs. Henderson stated to plaintiff she wanted him to "handle this thing for me." Plaintiff thereupon prepared all papers incidental to the admission of the will to probate; arranged for the testimony of the witnesses to the will; appeared in court and presented the testimony of Mrs. Henderson, Mrs. Bridges, and the witnesses to the will; provided for, counseled, and participated in arrangements to meet pending business obligations; and, to all intents and purposes, became the attorney in fact and of record for the estate. Although the relationship thus established was terminable at the will of the parties, we are convinced the evidence and the reasonable inferences therefrom amply support the trial court's finding of an existing attorney-client relationship which plaintiff had every right to anticipate would continue, and which would have continued but for the intervention of defendants. Under such circumstances, we will not disturb the trial court's finding. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn. (2d) 570, 343 P. (2d) 183 (1959).

Defendants next assert that the evidence does not support the trial court's finding that they had knowledge of the existence of the attorney-client relationship in issue. Here again, the evidence and the inferences therefrom produce a conflict. On the one hand, defendants claim they were advised by Mrs. Bridges that plaintiff's employment was limited. On the other hand, plaintiff's evidence indicates that defendants were not only aware of plaintiff's position as attorney in fact and of record for the estate, but in fact boasted of their ability to terminate that relationship. Additional evidence supportive of plaintiff's version is the admission of defendants that they determined to give plaintiff a "line of hot air" when he called upon them, rather than

rely upon what they now assert was their knowledge of his status in the estate.

■ Although knowledge of the existence of the business relationship in issue is an essential element in establishing liability for interference therewith, it is sufficient if the evidence reveals that the alleged interferor had knowledge of facts giving rise to the existence of the relationship. It is not necessary that the interferor understand the legal significance of such facts. Restatement, Torts § 766 Comment e.

We are satisfied that the evidence presented supports the trial court's finding of the requisite knowledge of the circumstances on the part of defendants. The finding falls within the ambit of the rule of *Thorndike v. Hesperian Orchards, Inc., supra,* and will not be disturbed.

Defendants next contention is that plaintiff's employment as attorney for the estate created a conflict of interest with his duties as a member of the local school board, and was, therefore, contrary to public policy and invalid. This is predicated upon the fact that the Henderson Construction Company had pending before the school board a bid for school construction at the time plaintiff initiated the probate proceedings.

We find no merit in this contention because (a) plaintiff stepped down from the school board at the time it considered the bid; (b) the board did not consider the bid until May 12, 1958, at which time plaintiff's services with the estate had been terminated; (c) the board, upon advice of the prosecuting attorney, rejected the bid; and (d) neither plaintiff nor his successor represented the estate before the school board. It is possible that had plaintiff continued as counsel for the estate he would have been confronted with a choice between his position upon the school board and as attorney for the estate. The fact is, however, that he was not afforded this opportunity, and speculation that he might have made a wrong choice cannot now form the basis of a declaration that his continued employment as attorney for the estate would have been invalid. Particularly is this so in the face of the unchallenged finding by the trial court

that plaintiff acted "at all times herein material . . . with the highest degree of integrity consistent with the professional ethics of an attorney at law."

Defendants next contend that their interference with plaintiff's relationship to the estate was privileged. Defendants predicate this assertion upon the claim that they occupied a confidential relationship with Mrs. Henderson by virtue of their long time service to the Hendersons as tax consultants. In essence, defendants rely upon the privileges capsulized in Restatement, Torts §§ 770[1] and 772,[2] or a combination thereof.

The basic reason supporting both of the mentioned privileges is the protection of public and private interests in freedom of communication, decent conduct, and professional as well as lay counsel. Such privileges, however, do not justify officious, self-serving, or presumptious assumption of responsibility and interference with the rights of others. The burden of establishing the existence of such a privilege or privileges rests, as heretofore indicated, upon the one asserting justification thereby.

We are satisfied, from our examination of the record, that defendants have not sustained their burden of proof. Suffice it to say the evidence supports the trial court's finding that defendants' interference was malicious, intentional and without justification.

Defendants' fourth major contention revolves about the issue of damages. Plaintiff alleged, prayed for, and was awarded damages in an amount equal to the attorney's fee he would have received had he concluded the probate of

---

[1]"One who is charged with responsibility for the welfare of another is privileged purposely to cause him not to perform a contract, or enter into or continue a business relation, with a third person if the actor

"(a) does not employ improper means and

"(b) acts to protect the welfare of the other." Restatement, Torts § 770.

[2]"One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by giving honest advice to the other within the scope of a request for advice made by him, except that, if the actor is under a special duty to the third person with reference to the accuracy of the advice, he is subject to liability for breach of that duty." Restatement, Torts § 772.

the estate. The trial court deducted from the amount established by the evidence, by way of mitigation, the sum of $1,000 upon the theory that plaintiff had refused compensation for the services he had performed prior to his termination.

Defendants contend that plaintiff pursued an improper measure of damages, asserting that the amount alleged, proved, and awarded represented the *gross* fee plaintiff would have received, rather than the *net* profit he would have realized had his services been continued. Thus, defendants argue, plaintiff failed in his proof upon the issue of damages in that he did not present evidence bearing upon the amount and value of the time, effort, and costs saved to him by reason of his nonperformance. In short, defendants contend that the measure of damages in the tort action of intentionally interfering with a business relationship should be the same measure as that utilized in a breach of contract action.

We cannot agree with defendants for the following reasons: (1) The action sounds in intentional tort rather than in breach of contract; (2) the tort here involved relates to the interruption of professional services, the uninterrupted performance of which comprehends many intangible values not wholly susceptible of proof; (3) the damage here claimed is the value of the professional business expectancy interfered with, prima facie proof of which is the reasonable value of such services; and (4) evidence bearing upon the amount and value of the time, effort, and costs actually expended in performance of the services in issue is, and would be in most cases of like nature, as readily available to defendants as to plaintiff.

We conclude, therefore, that if defendants would offset the damages as claimed in the manner asserted, the burden rested upon them to affirmatively allege and offer proof upon such offset. Absent such allegations and proof, the trial court did not err in assessing damages based upon the evidence before it.

Lastly, defendants contend the trial court erred in the admission of certain evidence.

The first assignment of error under this contention concerns evidence relating to purported interference by defendants with the probate of an estate by another attorney several years prior to the incident here involved. The offer of this evidence was prompted by defendants admitted reference to the incident in their conference with plaintiff on May 9, 1958. Defendants contend, however, that this evidence was not relevant to the issues of this case.

■ It is the general rule, of course, that in civil actions evidence concerning similar acts, conduct, or representations is inadmissible for the purpose of proving the act charged in the complaint. However, there are exceptions to this rule. In *May v. Roberts*, 126 Wash. 645, 650, 219 Pac. 55 (1923), we said:

" . . . The exceptions found in all or some of the authorities we think may be stated thus: (1) proof of separate but similar acts or representations may be received for the purpose of tending to show the intention, motive or knowledge of the defendant in connection with the act or representation upon which the action is based; . . ."

Intent and knowledge being issues in the instant case, the trial court did not err in admitting the evidence in question.

The second assignment of error under this contention relates to the admission of testimony which defendants claim constitutes hearsay.

■ We find no merit in this assignment for the reason stated in *Primm v. Wockner*, 56 Wn. (2d) 215, 218, 351 P. (2d) 933 (1960):

" . . . This case was tried to the court. If hearsay was admitted, it was harmless error, inasmuch as the trial court's findings are supported by competent evidence. [citing cases]"

The judgment is affirmed.

OTT, C. J., DONWORTH, FINLEY, and WEAVER, JJ., concur.

December 1, 1964. Petition for rehearing denied.