522 P.2d 1102

Hubert R. BARLOW, Plaintiff-Respondent,

v.

INTERNATIONAL HARVESTER COMPA-
NY, a corporation, Defend-
ant-Appellant.

UPPER VALLEY EQUIPMENT CO., a cor-
poration, Plaintiff-Respondent,

v.

INTERNATIONAL HARVESTER COMPA-
NY, a corporation, Defend-
ant-Appellant.

Nos. 11354, 11342.

Supreme Court of Idaho.

Rehearing Denied June 11, 1974 (Vacating
Prior Opinion).

Richard C. Fields, of Moffatt, Thomas, Barrett & Blanton, Boise, for defendant-appellant.

A. L. Smith, of Albaugh, Smith & Pike, Idaho Falls, for plaintiffs-respondents.

DONALDSON, Justice.

The petition for rehearing filed April 12, 1974, is denied.

The previous opinion issued in this case on March 25, 1974, is withdrawn and this opinion is hereby substituted therefor.

This is an appeal by International Harvester Company, Inc., from two judgments awarding money damages to Hubert R. Barlow and Upper Valley Equipment Co., Inc., for slander and tortious interference with contract. Barlow and Upper Valley originally commenced two separate actions against International Harvester and five of its employees. The five individual defendants were F. L. Fernald, district manager of the Portland, Oregon, regional office of International Harvester, now retired; D. F. Carlson, Portland district credit manager; Harvey Martin, sales manager for the Portland district; Joe Peterson, area representative of the credit department; and Eldred W. Olson, a managerial employee for the Portland district. The actions were predicated on basically the same set of facts and were consolidated for trial by the stipulation of all the parties.

During this litigation, the defendants moved for summary judgment, directed verdict, and judgment notwithstanding the verdict or in the alternative for a new trial. All of these motions were denied by the district court and the appellant, International Harvester, assigns these denials as error.

We will not discuss at length the district court's denial of defendants' motion for summary judgment, except to say that the district court's refusal was correct. "It is a fundamental rule of law that a summary judgment may not be granted where a genuine issue of material fact exists." Davis v. McDougall, 94 Idaho 61, 63, 480 P.2d 907, 909 (1971); I.R.C.P. 56(c). To enumerate only a few of the issues of fact "requiring the weighing procedures of a trial," Stationers Corporation v. Dun &

Bradstreet, Inc., 62 Cal.2d 412, 42 Cal.Rptr. 449, 452, 398 P.2d 785, 788 (1965), there was a question whether any of the allegedly tortious acts were in fact committed; there was, as will be discussed *infra,* the issue of whether the allegedly slanderous statements, though privileged, were uttered with malice. There was also a question of whether the alleged interference with contract was justified. All these issues are jury questions and it would have been error for the district court to grant the defendant's motion for summary judgment.

■ On a motion for directed verdict pursuant to I.R.C.P. 50(a) or for judgment notwithstanding the verdict, pursuant to I. R.C.P. 50(b), the moving party admits the truth of the adverse evidence and every inference that may be legitimately drawn therefrom. Mann v. Safeway Stores, Inc., Idaho, 518 P.2d 1194 (1974); Curtis v. Dewey, 93 Idaho 847, 848, 475 P.2d 808 (1970); Bratton v. Slininger, 93 Idaho 248, 253, 460 P.2d 383 (1969). Neither motion should be granted if there is substantial evidence to justify submitting the case to the jury or to support the verdict once it has been returned. Mann v. Safeway Stores, Inc., *supra;* Dawson v. Olson, 94 Idaho 636, 641, 496 P.2d 97 (1972); Curtis v. Dewey, *supra,* 93 Idaho at 849, 475 P.2d 808; Mabe v. State ex rel. Rich, 86 Idaho 254, 385 P.2d 401 (1963).

> "By substantial, it is not meant that the evidence need be uncontradicted. All that is required is that the evidence be of such sufficient quantity and probative value that reasonable minds *could* conclude [that a verdict in favor of the party against whom the motion was made] was proper." Mann v. Safeway Stores, Inc., *supra,* 518 P.2d at 1198.

The motions for directed verdict and judgment notwithstanding the verdict were properly denied. Although the testimony presented at the trial of these actions was in many instances conflicting, the respondents introduced substantial competent evidence to support the following version of the controversy.

Upper Valley Equipment Company, an Idaho corporation, had carried on a profitable and flourishing business as a dealer in farm equipment in Rexburg, Idaho, since 1963. Upper Valley held the Rexburg franchise for the sale and distribution of International Harvester farm equipment. Respondent Hubert Barlow had been employed by Upper Valley since 1963 in the capacity of manager of its Rexburg dealership. Under Barlow's management, the dealership had grown to be one of the largest in the area. Until 1969, the stock in Upper Valley was owned by Snake River Equipment Company, a corporation controlled by Barlow's uncle, George Watkins. Either Watkins personally, or Snake River Equipment, was the guarantor of Upper Valley's line of credit with International.

Barlow had for some time been desirous of acquiring ownership of Upper Valley, and was encouraged in this wish by his uncle. However, Barlow was in need of "working capital." Such working capital was needed for Upper Valley to function successfully because it made many sales on credit, but was contractually required to pay International the full wholesale price of each piece of new equipment immediately after it was sold by the dealership. As a matter of practice, a ten-day grace period was allowed, after which interest was added to the amount due. Therefore, the more flourishing and successful the business, the more working capital was needed for the business to continue to sell the equipment to its customers "on time," and at the same time pay International.

Early in 1969, Barlow worked out the following solution to his problem. Barlow's mother was the owner of a large block of stock in the Snake River Equipment Company, the corporation which owned the Upper Valley stock. Barlow's mother exchanged her Snake River stock for all the Upper Valley stock and then gave Barlow fifty-five per cent of it, in return for his promise to support her. At Barlow's request, she assigned the balance of the stock, forty-five per cent, to Robert Pinder, pursuant to an agreement between

Barlow and Pinder that Pinder would furnish $100,000 of working capital to the corporation and assume the role of guarantor of its debts, in exchange for forty-five per cent of its stock. The $100,000 in working capital promised by Pinder was absolutely essential for the continued successful functioning of the Upper Valley equipment dealership.

Early in 1969, after Barlow and Pinder had acquired the stock in Upper Valley, they set about arranging for the continuation of the International Harvester franchise under Upper Valley's new ownership. In April, 1969, Barlow and Pinder flew to Portland for discussions with F. W. Fernald, the district manager of International's Portland, Oregon, regional office, and Harvey Martin, sales manager for the Portland district. Barlow and Pinder explained the new ownership of Upper Valley and the agreement by which Pinder was to provide the dealership with working capital. Pinder and Barlow submitted financial statements and Pinder signed a written guarantee of Upper Valley's line of credit with International.

On June 12, 1969, a "written dealer sales agreement" retroactive to February, 1969, was executed, transferring the International Franchise to Upper Valley under the new, Barlow-Pinder ownership. The agreement was mailed to Barlow on June 16, 1969. All during the period of the change in ownership, Upper Valley was conducting business as usual, and selling a large volume of equipment.

On July 1, 1969, Barlow's banker informed him that a check for $13,500, payable to International Harvester Company, was at the bank and that there were insufficient funds to cover it. Barlow asked the banker to hold up the check temporarily and the banker said that he would hold it for five days, as he had done routinely before. Barlow was not concerned at this point because he knew that Pinder would, pursuant to the financing contract, provide the capital needed to cover the check. On July 3, 1969, Barlow called Pinder in Salt Lake City and told him that he needed new capital. Pinder asked how much, suggesting as much as $50,000. Barlow said that $15,000 would be sufficient. As the next three days were non-business days (the Fourth of July, a Saturday, and a Sunday), Pinder's check for the $15,000 did not reach Barlow's bank until Monday, July 7, 1969. Meanwhile, the insufficient fund check for $13,500 was returned to International, and was received at its offices on or about July 8. On that same day, a Mr. Gruber, a credit employee of International Harvester, called on Barlow regarding the insufficient fund check. Barlow told Gruber that $15,000 had been received from Pinder and that the $13,500 check would be honored, but Gruber disregarded that information and demanded a certified check for the $13,500 plus other amounts that had come due, amounting to $34,000 in all. Barlow then collected some accounts receivable and paid all of the balance owing to International except approximately $8,000. He thereupon called Pinder on July 9, or July 10, 1969 and asked for an additional $10,000. Pinder refused to send the money saying that he was about to leave for Panama on business and telling Barlow to stall International Harvester. It appears from Pinder's testimony that the reason for his refusal was that shortly before Barlow's request, Pinder had received a long-distance telephone call from Harvey Martin, the district sales manager for International Harvester. According to Pinder's testimony, Martin told him that Barlow was a liar and a thief, that criminal charges could be brought against Barlow, that Upper Valley was "out of trust" with International, that Pinder had been "very badly taken," that monies had been stolen, and that Pinder should have Barlow put in jail. Pinder also testified that Martin told him that there was no management or accounting in Upper Valley and that it was "not operating as a business entity." Pinder told Martin that he had recently sent $15,000 to the business, but Martin said that the $15,000 did not appear in the business. This conversation went on for some

time in the same vein. Pinder was stunned and shocked, but he believed Martin. Not wanting to hurt Barlow, Pinder did not tell him of the telephone call.

Because Pinder continued to refuse to supply the money he had contracted to supply, Upper Valley was unable to pay its debts to International in full. Consequently, International required Barlow to place a lien upon almost all the assets of Upper Valley corporation and required that all subsequent purchases by the dealership from International be made on a cash basis. These restrictions drastically curtailed Upper Valley's sales. Employees of International, including some of the five individual defendants, converged on the Rexburg dealership, interfered with the business and insulted Barlow in front of prospective customers.

During the next two months, several meetings were held regarding the future of Upper Valley. At those meetings the five individual defendants told Pinder that Barlow was incapable of running the business, that he had misappropriated money and that Pinder should not put any more money into the business under Barlow's management. In August, 1969, International presented Pinder with a statement of assets and liabilities of Upper Valley which represented its net worth at a figure between $80,000 and $100,000 short of its actual net worth at that time. This was an erroneous statement, but was accepted as correct by Pinder, and it confirmed to Pinder that the business was in serious trouble. The rigid restrictions resulting from lack of capital to pay its debts made it impossible for Upper Valley's business to continue. In October, 1969, International canceled Upper Valley's franchise and the dealership closed.

Pinder also testified the slanderous telephone call caused him to cease financing a mining joint venture which he and Barlow had entered into in 1968. Under the terms of the mining agreement, Pinder was to supply funds and Barlow the manpower to seek out promising pieces of land for future mining exploitation. Barlow had acquired "lease-options" on several pieces of property, with funds supplied by Pinder, which were lost when Pinder refused to continue payments.

Upon learning Pinder's story of the occurrences of the summer of 1969, Barlow and Upper Valley brought suit against International and the five individual employees alleging slander and interference with the Upper Valley financing contract. After trial, the jury returned verdicts against International Harvester awarding money damages to Barlow in the amount of $75,000 and to Upper Valley in the amount of $100,000. From the judgments entered on these verdicts and from the district court's denial of the above-discussed motions, International Harvester has appealed.

I

Appellant International's first assignment of error deals with the verdicts returned by the jury in this action. The verdict in favor of Hubert Barlow reads as follows:

"We the jury, duly impaneled and sworn to try the above-entitled cause, find for the plaintiff and assess damages against the International Harvester Company and individual defendants [blanks], in the amount of: $75,000.00 (seventy-five thousand)."

The verdict in favor of Upper Valley was virtually identical except that damages were assessed at $100,000. The jury was instructed to write the names of the individual defendants on the verdicts if they were found liable. The actual verdict forms submitted to the jury are not reproduced in the record, but we are informed that they contained blanks for this purpose. As appears above, no names were inserted by the jury. The district court entered judgment on the verdicts in favor of the five individual defendants, and against International Harvester in the amounts specified.

International claims that the two verdicts express the jury's conclusion that the individual defendants were exonerated from liability. International further argues that its liability, if any, was grounded on the concept of *respondeat superior,* and submits that the judgments against International cannot stand when a determination has been made in favor of the employees on whose alleged tortious conduct International's liability was predicated.

We are not persuaded by these contentions. In the first instance, the verdicts are equally consistent with a mere failure by the jury to make a finding as to the individual employees as they are with exoneration of the employees. The failure of the jury to return a verdict as to the servant while rendering one against the master based on *respondeat superior* does not relieve the master of liability. Brokaw v. Black-Foxe Military Institute, 37 Cal.2d 274, 231 P.2d 816 (1951).

A jury verdict against one defendant is not necessarily to be construed as a verdict in favor of other defendants, but may merely represent a failure to make any finding as to those others. Bradley Min. Co. v. Boice, 194 F.2d 80, 82 (9th Cir. 1951), petition for rehearing denied, 205 F.2d 937 (9th Cir. 1953), cert. denied, 346 U.S. 874, 74 S.Ct. 125, 98 L.Ed. 382 (1953); Abrams v. Lange, 158 Neb. 512, 63 N.W.2d 781 (1954); State Rubbish Collectors Ass'n v. Siliznoff, 38 Cal.2d 330, 240 P.2d 282 (1952). *See also* Browand v. Scott Lumber Co., 125 Cal.App.2d 68, 269 P.2d 891 (1954).

An error in the instructions of the district court, favorable to the five individual defendants but not objected to by the respondents, strengthens the possibility that the verdicts of the jury may represent no finding as to the employees, rather than a finding of exoneration. Plaintiffs-respondents Barlow and Upper Valley, in addition to alleging the commission of the torts of slander and interference with contract, alleged that the five individual defendants had conspired to commit these torts. In Instruction Twenty, the district court charged the jury that:

> "[I]n this case plaintiff has charged the defendants with conspiracy. He has charged that the words spoken were spoken by the defendants or by one of them during the course of his duties as an officer of the corporation and within the scope of his duties as an officer of the corporation. Therefore, if you find that the defamatory words were spoken by one of the named defendants, that they were untrue and that plaintiff was injured thereby, you may allow damages against the corporation even though you do not find a conspiracy. *If you are unable to find a conspiracy, however, then you cannot award any damages against any individual defendant.* If you do find a conspiracy you must charge all of the individual defendants with damages." (Emphasis added.)

It is to be presumed that the jury followed the instructions of the district court. *Cf.* Mattson v. Bryan, 92 Idaho 587, 593, 448 P.2d 201 (1968). The emphasized portion of the above instruction represents an incorrect statement of the law, potentially prejudicial to the respondent only. It may explain the jury's failure to make a finding as to the individual defendants. In the recent Oregon case of Still v. Benton, 251 Or. 463, 445 P.2d 492, 494–495 (1968), the court stated:

> "When a plaintiff alleges and proves that several defendants conspired to commit a tort upon him, all the defendants involved in the conspiracy can be held liable for the overt act which is committed by one of the defendants pursuant to the conspiracy. If a conspiracy is not proved, only those defendants can be held liable who are alleged and proved to have personally committed a tortious overt act against the plaintiff.
>
> \* \* \* \* \* \*
>
> " 'It was not essential to recovery that there be proof of conspiracy. Conspiracy is not the gravamen of the com-

plaint. The injury of which plaintiff complains was possible of accomplishment by the act of either defendant. Of course, if judgment were to be obtained against both defendants, proof of conspiracy or joint action would be essential.' " Quoting Keller v. Commercial Credit, 149 Or. 372, 40 P.2d 1018, 1020 (1935).

In the case before us, it is entirely possible that the jury considered that one or more of the individual defendants had been guilty of the torts alleged, but found no conspiracy. In such a case, under the district court's instruction, the jury would have had no choice but to omit the names of all the individual defendants, regardless of their findings as to the tortious conduct of one or more of them.

■ Furthermore, in Idaho,

"The verdict of a jury can only be set aside on appeal for want of substantial evidence to support that particular verdict, and not because the verdict may seem inconsistent with another verdict, or because another verdict is wrong, or some other party has been discharged or exonerated." Strickfaden v. Greencreek Highway Dist., 42 Idaho 738, 769, 248 P. 456, 465 (1926).

*See also*, Judd v. Oregon Short Line R. R. Co., 55 Idaho 461, 478, 44 P.2d 291 (1935); R. J. Reynolds Tobacco Co. v. Newby, 153 F.2d 819 (9th Cir. 1946).

■ Finally, in the instant case, we find in the record no objection by the appellant or respondent to the form of the verdicts when they were submitted to the jury or when they were returned into court. Failure to object to the form of a general verdict at the time of its submission of reception constitutes a waiver of the right to do so. Anderson v. Blackfoot Livestock Comm. Co., 85 Idaho 64, 79, 375 P.2d 704 (1962); Pilkington v. Belson, 66 Idaho 724, 729, 168 P.2d 815 (1946); Judd v. Oregon Short Line R. R. Co., *supra*, 55 Idaho at 479, 44 P.2d 291.

## II

The appellant submits that it was error for the district court to allow the issue of slander to go to the jury and that it was entitled to a directed verdict on the slander counts of the complaints. More specifically, appellant claims that the alleged statements were not slanderous per se, that they were true, and that they were privileged, all as a matter of law.

■ Defamatory utterances regarding an individual are slanderous per se, that is, actionable without allegation and proof of special damages, if they fall into one of four categories. One of these categories comprises utterances which impute "conduct constituting a criminal offense chargeable by indictment or by information either at common law or by statute *and* of such kind as to involve infamous punishment [death or imprisonment] or moral turpitude conveying the idea of major social disgrace." Cinquanta v. Burdett, 154 Colo. 37, 388 P.2d 779, 780 (1963); W. L. Prosser, Handbook of the Law of Torts § 112 (4th ed. 1971); Restatement of Torts § 571 (1938). Another of the four categories consists of utterances which "[ascribe] to another conduct, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, [or] profession * * *." Restatement of Torts § 573 (1938).

■ A defamatory utterance regarding a corporation is slanderous per se when it "assails its management or credit and inflicts injury on its business." Diplomat Electric, Inc. v. Westinghouse Electric Supply Co., 378 F.2d 377, 382–383 (5th Cir. 1967); Restatement of Torts §§ 561, 573 (1938).

" '[W]here a [defamation] contains an imputation upon a corporation in respect to its business, its ability to do business, and its methods of doing business, the same becomes [defamatory] per se, and * * * special damages need not be alleged.' " Diplomat Electric, Inc., *supra*,

378 F.2d at 383, quoting Maytag Co. v. Meadows Mfg. Co., 45 F.2d 299, 302 (7th Cir. 1930).

The Restatement of Torts § 615 (1938) characterizes in the following manner the respective functions of the court and the jury in determining whether an utterance is slanderous per se:

"(1) The court determines whether a crime * * * imputed by spoken language is of such a character as to make the slander actionable per se.

"(2) Subject to the control of the court whenever the issue arises, the jury determines whether spoken . language imputes to another conduct or attributes of character which are incompatible with the proper conduct of his business, trade or profession."

 Robert Pinder testified that Harvey Martin stated to him that Upper Valley had "absolutely no records and no semblance of records" and that, "There was no accounting. There was no management. It just was not operating as a business entity." In addition, Pinder testified that Martin accused Barlow, in his role as general manager of Upper Valley, of being a "thief" who had "stolen" Pinder's money and whom Pinder could have put in jail. By means of this testimony Upper Valley clearly established a prima facie case of slander per se.

This same testimony established a prima facie case of slander per se on behalf of Hubert Barlow. The jury could have found that Martin's statements that Barlow was a "thief", that he had "stolen" Pinder's money and that Pinder could have him put in jail, accused Barlow of a crime and were so understood by Pinder. It was not error for the district court to instruct the jury that calling another a "thief" is slander per se if the imputation is false. O'Cana v. Espinosa, 141 Colo. 371, 347 P.2d 1118 (1960); Safeway Stores v. Rogers, 186 Ark. 826, 56 S.W.2d 429 (1933); W. L. Prosser, Handbook of the Law of Torts § 112, p. 756 (4th ed. 1971); see 50 Am.Jur.2d Libel and Slander § 50 and cases cited therein at n. 15. The jury could also have found that Martin's statements imputed conduct to Barlow which was incompatible with the proper conduct of his business. We see no merit in appellant's contention that the statements imputing business incompetence and/or dishonesty did not refer with sufficient particularity to Hubert Barlow.

 The appellant next contends that the district court should not have allowed the issue of slander to go to the jury, because the allegedly defamatory statements were true. In this case the truth of the statements was in dispute and it would have been error to have relieved the jury of its obligation to weigh the evidence and determine truth or falsity. The district court correctly instructed the jury regarding the elements of the crimes of embezzlement, I.C. § 18–2406, and drawing a check without funds, I.C. § 18–3106. The presence or absence of the elements of these crimes, particularly the element of fraudulent intent, was a question for the jury. See State v. Sedam, 62 Idaho 26, 107 P.2d 1065 (1940); State v. Peters, 43 Idaho 564, 253 P.2d 842 (1927). Furthermore, the truth of one accusation of crime does not relieve one from liability for the false imputation of another crime. W. L. Prosser, Handbook of the Law of Torts § 116, p. 798 (4th ed. 1971). We note additionally that failure of a debtor to pay his creditor is not ordinarily embezzlement. R. M. Perkins, Criminal Law 292 (2nd ed. 1969).

On the subject of the derogatory words allegedly spoken regarding Upper Valley, it would be virtually impossible to say that these statements were proven true as a matter of law. The defense of truth was for the jury to consider.

 Finally, the appellant contends that the issue of slander should not have been submitted to the jury because the alleged statements were privileged as a matter of law. We recognize that there exists

a conditional or qualified privilege which protects the publisher of defamatory material from liability if the publication is made to one who shares a common interest, as for example, a business relationship. *See, e. g.,* Walker & Associates, Inc. v. Remie Jaussaud & Assoc., 7 Wash.App. 70, 497 P.2d 949 (1972); Abrahamsen v. Mountain States Telephone & Tel. Co., 494 P.2d 1287 (Colo.1972); Stationers Corporation v. Dun & Bradstreet, Inc., *supra*; Restatement of Torts § 596 (1938). However, this and other qualified privileges may be lost through abuse. One form of such abuse is the publication of the defamatory material with express malice. Walker & Associates, Inc. v. Remie Jaussaud & Assoc., *supra*, 497 P.2d at 951; Abrahamsen v. Mountain States Telephone & Tel. Co., *supra*, 494 P.2d at 1289. *See also* Coopersmith v. Williams, 171 Colo. 511, 468 P.2d 739, 741 (1970); Stationers Corporation v. Dun & Bradstreet, Inc., *supra*, 42 Cal.Rptr. 449, 398 P.2d at 789. Express malice, or malice in fact, is the publication of defamatory matter in bad faith, without belief in the truth of the matter published, or with reckless disregard of the truth or falsity of the matter. *See, e. g.,* Walker & Associates, Inc. v. Remie Jaussaud & Assoc., *supra,* 497 P.2d at 951; Getchell v. Auto Bar Systems Northwest, Inc., 73 Wash.2d 831, 440 P.2d 843, 847 (1968).

■ The determination of whether a given set of facts constitutes a "privileged occasion," [1] in regard to liability for defamation, is a matter of law for the determination of the court. Abrahamsen v. Mountain States Telephone & Tel. Co., *supra,* 494 P.2d at 1289; Mahona-Jojanto, Inc., N.S.L. v. Bank of New Mexico, 79 N.M. 293, 442 P.2d 783, 785 (1968). In this case, the district court determined that, on the basis of International's business connections with Pinder, the occasion was privileged and so instructed the jury. On the other hand, the question of whether the publication was actuated by express malice,

and the privilege thereby nullified, is a question for the jury, Browder v. Cook, 59 F.Supp. 225, 231 (D.Idaho 1944); Abrahamsen v. Mountain States Telephone & Tel. Co., *supra,* 494 P.2d at 1289; Getchell v. Auto Bar Systems Northwest, Inc., *supra,* 440 P.2d at 847. The court may take the question of malice from the jury only if there is no evidence of malice and the undisputed facts admit only one conclusion. Coopersmith v. Williams, *supra*; Mohona-Jojanto, Inc., N.S.L. v. Bank of New Mexico, *supra. See also* Aku v. Lewis, 52 Haw. 366, 477 P.2d 162 (1970); Fairbanks Publishing Company v. Francisco, 390 P.2d 784 (Alaska 1964).

■ In the instant case, we find that there was competent evidence in the testimony of Pinder and Barlow from which the jury could have inferred that the defamatory statements were published with express malice. Therefore, for the district court to take the issue from the jury by means of a directed verdict or judgment notwithstanding the verdict would have been error.

### III

Appellant contends that neither plaintiff succeeded in making a prima facie case of the tort of interference with contract and that the motions for directed verdict made at the close of plaintiffs' evidence and at the close of all the evidence should have been granted. We note here that neither complaint alleged that the tort of interference with contract was committed with regard to the Pinder-Barlow mining venture. Rather, losses in the mining venture were alleged as one element of the damages flowing from the slander of Hubert Barlow. The only allegation of tortious interference with contract was made in regard to the financing contract whereby Robert Pinder had agreed to supply Upper Valley Equipment Company with $100,000 of working capital. Therefore, this discussion is limited to a consideration of the tort of

---

I. The term "privileged occasion" is employed in the Restatement of Torts, §§ 593 et seq. and has been widely used by the courts.

interference with contract with respect to the financing contract only.

 The cases justify the following generalizations about the tort of interference with contract:

(1) A prima facie case of the tort is established where the plaintiff adduces proof of these elements: (a) the existence of a contract, (b) knowledge of the contract on the part of the defendant, (c) intentional interference causing a breach of the contract, and (d) injury to the plaintiff resulting from the breach. Long v. Newby, 488 P.2d 719, 722 (Alaska 1971); Calbom v. Knudtzon, 65 Wash.2d 157, 396 P.2d 148, 151 (1964); Freed v. Manchester Service, 165 Cal.App.2d 186, 331 P.2d 689, 691 (1958). "Malice in the sense of ill-will is not required" to establish a prima facie case. Long v. Newby, *supra,* 488 P.2d at 722.

(2) Once the plaintiff has made a prima facie case, the burden is on the defendant to prove justification. Calbom v. Knudtzon, *supra,* 396 P.2d at 152; Mitchell v. Aldrich, 122 Vt. 19, 163 A.2d 833, 836 (Vt.1960).

(3) "Unlike the law of defamation, this branch of the law [interference with contract] has not crystallized a complete set of definite rules as to the existence or non-existence of privilege. * * * The issue in each case is whether the actor's conduct is justifiable under the circumstances; whether, upon a consideration of the relative significance of the factors involved, his conduct should be permitted despite its expected effect of harm to another." Restatement of Torts § 767, comment a at 63 (1939). "What is 'unwarranted' interference depends on the facts of each case." Watson v. Settlemeyer, 150 Colo. 326, 372 P.2d 453, 456 (1962). *See also* Freed v. Manchester Service, *supra,* 331 P.2d at 691–692. When an action involving interference with contract is tried to a jury, it is ordinarily for the jury to determine whether the interference of the defendant was justified. Mitchell v. Aldrich, *supra,* 163 A.2d at 837; Jackson v. O'Neill, 181 Kan. 930, 317 P.2d 440, 443 (1957).

(4) Otherwise justifiable conduct is rendered unjustified where improper means, such as defamation, are employed by the defendant. W. L. Prosser, Handbook of the Law of Torts § 129, pp. 936–37 (4th ed. 1971). *See* Calbom v. Knudtzon, *supra,* 396 P.2d at 151.

 Appellant's specific objection is that the district court erred in submitting the issue of interference with contract to the jury, because the testimony of Barlow and Pinder established that there was an uncertainty as to one of the terms of the contract, namely the timing of the contribution of the $100,000 in "working capital" to Upper Valley. Appellant International Harvester contends that Barlow testified that the agreement specified that Pinder was to contribute the $100,000 in working capital as it was needed, while Pinder stated that the contributions in working capital were to be made at the rate of $50,000 the first year and $50,000 the second. Whether or not such alleged uncertainty of a term would have rendered the contract unenforceable in an action brought by one of the parties to the contract is irrelevant to the question of whether the plaintiffs established a prima facie case of the tort of interference with contract. Protection is extended against unjustifiable interference with contracts even though the contract is voidable[2] or unenforceable in an adversary proceeding. Mitchell v. Aldrich, *supra,* 163 A.2d at 836; W. L. Prosser, Handbook of the Law of Torts § 129, p. 932 (4th ed. 1971). As was stated in the Kansas case of Jackson v. O'Neill, *supra,* 317 P.2d at 443:

"The trouble with plaintiff's contention is that he was not a party to this contract. Such a contention might have been important if one of the parties to the contract had refused to perform. The weakness of plaintiff's argument is

2. The rule is otherwise with regard to contracts void *ab initio. See* W. L. Prosser,

Handbook of the Law of Torts § 129, p. 931 (4th ed. 1971).

that the contract was not subject to collateral attack by him or any other third party. The contract was valid for all purposes except as a basis for an action to enforce it. Plaintiff cannot make lack of mutuality of the contract, to which he was not a party, available as an excuse for his wrongful and unjustifiable conduct * * *."

Although International was a party to the contract whereby Pinder agreed in writing to be the guarantor of Upper Valley's debts to International, it was not a party to the oral financing contract. Therefore, the appellant's contention that there was a failure of proof as to interference with contract, because of failure to prove the existence of an enforceable contract, is without merit.[3]

### IV

Many of appellant's objections regarding alleged errors in the instructions to the jury have been answered by our discussions of the substantive law of the torts of slander and interference with contract. It would serve no useful purpose to recapitulate that discussion here. A brief examination of those alleged errors meriting individual treatment follows.

The district court recognized that the business relationship between Pinder and International Harvester created a privileged occasion under the law of slander, and so instructed the jury in instruction 22. Instruction 22 also informed the jury that before they could find privileged statements to be the basis of liability, they would have to find that the statements were made with malice. The district court's explanation of malice in instructions 22 and 23 conformed with that set forth in an earlier part of this opinion.

Instructions 29 through 32 correctly instruct the jury on the essential requirements for the formation of a contract, rendering unpersuasive appellant's contention that instruction 31 alone does not fully perform this function. We stress here that enforceability of the financing contract in an adversary proceeding between the parties to the contract was not at issue in this action. Additional instructions on the finer points of contract law would have served no useful purpose.

*Instruction 34 reads:*

"Ladies and gentlemen, if you find that there was a valid and subsisting and enforceable contract between Robert Pinder and Hubert Barlow in this case whereby Mr. Pinder agreed to furnish money to the extent of $100,000.00 to Mr. Barlow as needed in the operation of his business then you may consider whether or not the defendants or any of them interfered with the performance of that contract and by their interference caused a breach thereof.

"In its complaint the plaintiff has charged that the defendants interfered with the performance of the contract by the words which they spoke or uttered as contained in the complaint. If you find that these words were not defamatory and that damages cannot be allowed for slander you may still consider whether or not such words did create or did amount to an interference with the contract between the parties and you may consider whether or not it caused or procured a breach thereof."

Appellant objects to this instruction on three grounds: (1) that it does not correctly state the law of interference with contract, (2) that it removes from the charge the element of privilege, and (3) that it omits reference to the elements nec-

---

3. Although the appellant did not raise the issue of voidability because of noncompliance with the statute of frauds, we note that a contract voidable because of such noncompliance may still be the subject matter of an action for interference with contract. W. L. Prosser, Handbook of the Law of Torts § 129, p. 932 (4th ed. 1971). Moreover, the contract was apparently fully performed on one side when Pinder received forty-five per cent of the stock in Upper Valley as consideration for his promise to provide $100,000 in working capital.

essary to establish an action for interference with contract. This instruction is one of several given by the district court concerning the law of interference with contract. The elements of the tort are spelled out in instruction 28. We are unable to agree that this instruction, although it would be incomplete if read in isolation, contains an incorrect statement of the law, except insofar as the "enforceability" places a heavier burden on the plaintiff than is required. Furthermore, as we noted *supra,* the rules governing the determination of "privilege" in the law of defamation, and "justification" in the law of interference with contract, are not identical. In the case of defamation, the court determines as a matter of law whether the defamatory words were spoken on a privileged occasion, leaving for the jury the question of malice, if the occasion is ruled to be qualifiedly privileged. In the case of interference, it is for the jury to determine whether the interference was justified, in light of surrounding circumstances. Therefore, it would have been error for the district court to have found justification or its absence as a matter of law, with regard to the alleged interference.

Instruction 38 states that before liability can be found for interference with contract, it must be proven that the defendants had knowledge of the contract. Appellant submits that "there is a void of proof that the defendants had knowledge of the alleged oral mining agreement." The fact that this may be true does not invalidate the instruction. First, the instruction has no particular reference to the mining agreement and is merely a general instruction relating to the tort of interference with contract. Secondly, as we noted earlier, the tort of interference was never alleged with regard to the mining agreement. Evidence concerning the mining agreement was merely introduced to prove one element of damages resulting from the alleged slander of Hubert Barlow.

■ In instructions 17, 18, 19, and 20, the district court referred to the individual defendants as "corporate officers" and the appellants contend that this was prejudicial error. The particular instructions in question would have been equally valid had the word "servants" or "agents" been substituted for the word "officers." The choice of the word "officers" did not in any way increase the vulnerability of appellant corporation to liability and was therefore, at most, harmless error.

■ The appellant contends that the district court should have omitted from its instructions all references to conspiracy because conspiracy was "not established." There was some evidence from which the jury could have inferred that the individual defendants were acting in concert, particularly in regard to the series of meetings at which Robert Pinder was allegedly encouraged not to furnish further money to Upper Valley. Furthermore, any error in the instructions on conspiracy could only have been prejudicial to the five individual defendants, who are now in possession of judgments in their favor and are not parties to this appeal.

■ We have carefully reviewed the instructions which were requested by the defendants and which the appellant now claims should have been given by the district court. In our view, requested instructions 9, 15, and 21 contain erroneous statements of the law applicable to the facts of this case, and were correctly refused. The instructions given by the district court adequately and correctly covered the subject matter of the remainder of the requested instructions and refusal to give them was not error. Jorstad v. City of Lewiston, 93 Idaho 122, 130, 456 P.2d 766 (1969).

V

■ Appellant contends that because Robert Pinder and respondent Hubert Barlow were joint-venturers or partners in the mining exploration project, Robert Pinder was an indispensable party plaintiff in Hubert Barlow's suit. Appellant assigns the failure to join Pinder as error. This issue was not raised at any point in the trial court, but is presented for the first time on this appeal.

We will assume for the purposes of this decision that the failure to join an indispensable party is a matter of such importance that it cannot be waived, but may be considered for the first time on appeal. I. R.C.P. 12(h). *But see* Jolley v. Puregro Company, 94 Idaho 702, 706, 496 P.2d 939 (1972). Having made this assumption, it seems clear that Robert Pinder was not an indispensable party to Hubert Barlow's action for slander. Whether or not a party is indispensable to an action depends largely upon the relief sought. Idaho Irr. Co., Ltd. v. Dill, 25 Idaho 711, 716, 139 P. 714 (1914). Hubert Barlow did not seek recompense for injury to the mining venture, but for injury to himself because of the alleged slanders. As mentioned earlier, loss of a profitable business opportunity—the chance to participate with Pinder in the mining venture—was merely one of the elements of damage pleaded by Barlow. Pinder's rights are in no way affected.

## VI

We turn now to appellant's assignments of error which relate to the issue of damages. Although appellant has discussed in detail certain of respondents' evidence of special damages which allegedly did not meet the standard of "reasonable certainty," e. g., Jolley v. Puregro, *supra,* it has been stressed that appellant does not now object to the admission of such testimony. Rather, appellant simply submits that there was not sufficient competent evidence to support either the $75,000 verdict in favor of Hubert Barlow or the $100,000 verdict in favor of Upper Valley Equipment Co., and that the jury could not have arrived at those amounts without resort to speculation and conjecture. In the view of this Court, there was sufficient evidence introduced at trial to justify the amounts of the verdicts without reliance on the allegedly speculative testimony. We note at this point that the district court in its instructions thoroughly cautioned the jury against reliance on speculative or conjectural evidence of damages.

The almost universal rule regarding general damages in actions for defamation per se is concisely stated in the Washington case of Michielli v. U. S. Mortgage Co., 58 Wash.2d 221, 361 P.2d 758, 762 (1961):

"Where a defamation is actionable *per se*, and neither truth nor privilege is established as a defense, the defamed person is entitled to substantial damages without proving actual damages."

*Accord,* Pacific Packing Co. v. Bradstreet Co., 25 Idaho 696, 702, 139 P. 1007 (1914); Pagosa Hot Spring, Inc. v. Arnold, 493 P. 2d 383, 386 (Colo.Ct.App.1972); Eslinger v. Henderson, 80 N.M. 479, 457 P.2d 998, 1000 (1969); Getchell v. Auto Bar Systems Northwest, Inc., *supra,* 440 P.2d at 848; Restatement of Torts § 621 and comment a (1938). *See also* Boice v. Bradley, 92 F.Supp. 750 (D.Idaho 1950), aff'd sub nom. Bradley Mining Co. v. Boice, 194 F.2d 80 (9th Cir. 1951) where $60,000 general damages were awarded for slander and false imprisonment without proof of special damages. A corporation, as well as an individual, can recover general damages without proof of special damages when the defamatory words concerning it are actionable per se. *See* Pacific Packing Co. v. Bradstreet Co., *supra*; Pagosa Hot Spring, Inc. v. Arnold, *supra*; Diplomat Electric, Inc. v. Westinghouse Electric Supply Co., 378 F.2d 377 (5th Cir. 1967).

The majority, and in our opinion, better, view adopts a tort, rather than contract, measure of damages for intentional interference with contract. Thus, in a proper case, general damages, damages for unforeseen expenses, and even punitive damages may be recovered. Recovery for interference is not limited to those damages within the contemplation of the parties to the contract as the probable and foreseeable result of a breach. W. L. Prosser, Handbook of the Law of Torts § 129, pp. 948–949 (4th ed. 1971); Restatement (Second of Torts § 774A, comments a–c, pp. 86–90 (Tent. Draft No. 14, 1969).

As previously discussed, the defamatory words allegedly spoken to Robert Pinder regarding Hubert Barlow and Upper Valley fall into the category of slander per se. Therefore, upon a jury finding

that the words were spoken, that they were not true, and that though conditionally privileged, they were spoken with malice, both Barlow and Upper Valley were eligible for substantial awards of general damages.

■ The district court properly instructed the jury that general damages might be awarded in the sum which appeared to them as being just and proper in view of all the circumstances of the case.

> "There is no exact measure of general damages which can be applied in either a libel or slander action. It is within the special province of the jury to determine the amount." Getchell v. Auto Bar Systems Northwest, Inc., *supra*, 440 P.2d at 848.

*Accord,* Boice v. Bradley, *supra*, 92 F.Supp. at 755.

■ With regard to special damages allegedly suffered by Upper Valley Equipment Co., Hubert Barlow presented extensive testimony regarding the net worth of the dealership before the commission of the alleged torts and the amount that Upper Valley was able to salvage after it closed. Admission of Barlow's testimony was proper. He was a fifty-five per cent owner of Upper Valley Equipment Company, and as such, permitted to testify as to the value of the company's assets.

> "It is a settled rule in Idaho that the owner of property is a competent witness to its value. In Rankin v. Caldwell, 15 Idaho 625, 632, 99 P. 108 (1908), this court said:
>
>> 'The general rule, that to qualify a witness to testify as to market value, a proper foundation must be laid showing the witness to have knowledge upon the subject, does not apply to a party who is testifying to the value of property which he owns. The owner of property is presumed, in a way, to be familiar with its value, by reason of inquiries, comparisons, purchases and sales. The weight of such testimony is another question, and may be affected by disclosures made upon cross-examination as to the basis for such

knowledge, but this will not disqualify the owner as a witness.'"

Riley v. Larson, 91 Idaho 831, 836, 432 P.2d 775, 780 (1967).

The gist of Barlow's testimony was that the business had an actual net worth in July, 1969, of $183,000 and that the net amount the business was able to salvage after it closed down as an active farm equipment dealership was in the vicinity of $97,000, a net loss of $86,000. This evidence was competent on the issue of Upper Valley's special damages. *Cf.* Morrison v. International Harvester Co. of America, 204 F.Supp. 6 (D.Colo.1962), appeal dismissed, 306 F.2d 492 (10th Cir. 1962). In light of the fact that Upper Valley was eligible for a substantial award of general damages, even in the complete absence of proof of special damages, we do not consider the general verdict of $100,000 in favor of Upper Valley to be excessive or unsupported by competent evidence.

■ There was substantial evidence from which the jury could have believed that as a direct result of the actions of appellant's agents, Hubert Barlow lost his employment, suffered great anxiety, humiliation and inconvenience, and that his reputation as a businessman in his community was severely damaged. In addition, there was evidence that Upper Valley owned Hubert Barlow from $14,000 to $18,000 in sales commissions dating from the period prior to his acquisition of ownership. When Upper Valley closed, Barlow lost the opportunity to recover this credit. We are unable to say that, based on competent evidence of general and special damages, an award of $75,000 is excessive.

Hubert Barlow alone sought punitive damages. The appellant contends that no instruction on punitive damages should have been given, relying on the rule enunciated in the recent case of Openshaw v. Oregon Automobile Insurance Co., 94 Idaho 335, 338, 487 P.2d 929, 932 (1971) where this Court stated:

> "To be entitled to an award of punitive damages against a corporation the complaining party must show that the

principal (or when the principal is a corporation, its directors and managing officers) participated in or authorized or ratified the agent's acts. Boise Dodge, Inc. v. Clark, 92 Idaho 902, 453 P.2d 551 (1969); Curtis v. Siebrand Bros. Circus & Carnival Co., 68 Idaho 285, 194 P.2d 281 (1948); Restatement of Torts, § 909."

Based on evidence produced at the trial to the effect that highly placed mangerial employees of International Harvester had engaged in tortious behavior toward the two plaintiffs, an instruction on punitive damages was permissible. The case of Boise Dodge, Inc. v. Clark, *supra*, 92 Idaho at 906, 453 P.2d 551, and section 909 of the Restatement of Torts,[4] cited with approval in the *Openshaw* case make clear that corporate liability for punitive damages may arise where there is participation in the alleged tortious conduct by a "managing and policy-making agent" as well as by a corporate director or officer.

A more difficult question is presented by appellant's request that we assume that the jury did in fact award punitive damages to Hubert Barlow and then evaluate that hypothetical award on the basis of guidelines for the limitation of punitive damages awards which were enunciated in the recent Idaho cases of Jolley v. Puregro, *supra*, and Cox v. Stolworthy, 94 Idaho 683, 496 P.2d 682 (1972). Inasmuch as the jury returned a general verdict in favor of Hubert Barlow in the amount of $75,000, this Court has no methods to ascertain what, if any, part of that general verdict represents exemplary damages. It might have been preferable had the jury been provided with a verdict form providing for the separate assessment of awards of general, special and punitive damages. However, failure to provide for the segregation of the different categories

of damages is not error where a more explicit verdict form was not requested. *Cf.* Anderson v. Blackfoot Livestock Comm. Co., *supra,* 85 Idaho at 79, 375 P.2d 704; Pilkington v. Belson, *supra,* 66 Idaho at 729, 168 P.2d 815; Judd v. Oregon Short Line R. R. Co., *supra,* 55 Idaho at 479, 44 P.2d 291. *See also,* Cunningham v. Simpson, 1 Cal.3d 301, 81 Cal.Rptr. 855, 859, 461 P.2d 39, 43 at n. 8 (Cal.1969).

As we stated in the recent case of Bratton v. Slininger, *supra*, 93 Idaho at 253, 460 P.2d at 388,

> "The amount of damages is a question of fact which is for the jury in the first instance and secondly for the trial judge on a motion for a new trial. Blaine v. Byers, 91 Idaho 665, 429 P.2d 397 (1967). The power of this court over excessive damages 'exists only when the facts are such that the excess appears as a matter of law, or is such as to suggest at first blush, passion, prejudice, or corruption on the part of the jury.'" quoting Mendenhall v. MacGregor Triangle Co., 83 Idaho 145, 358 P.2d 860 (1961).

In the instant case, the general verdicts rendered by the jury do not appear excessive as a matter of law and do not suggest bias, passion or prejudice on the part of the jury. We are not compelled to remand for a new trial on the issue of damages merely because the various categories of damages awarded by the jury were not made explicit. Boice v. Bradley, *supra*, 92 F.Supp. at 756; Pilkington v. Belson, *supra* 66 Idaho at 729, 168 P.2d 815.

We have carefully examined the appellant's other assignments of error, and have found no basis for reversal. The judgments of the district court are therefore affirmed. Costs to respondents.

SHEPARD, C. J., and McQUADE, McFADDEN and BAKES, JJ., concur.

---

4. "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, (a) the principal authorized the doing and the manner of the act, or, (b) the agent was unfit and the principal was reckless in employing him, or (c) *the agent was employed in a managerial capacity and was acting in the scope of employment,* or (d) *the employer or a manager of the employer ratified or approved the act."* (Emphasis added.)